Book Production Industries, Inc. v. Commissioner. John F. Cuneo v. Commissioner. John F. Cuneo and Julia S. Cuneo v. Commissioner.
Book Production Industries, Inc. v. Commissioner
Docket Nos. 2410-62, 2571-62, 2817-62 and 2849-62.
United States Tax Court
T.C. Memo 1965-65; 1965 Tax Ct. Memo LEXIS 265; 24 T.C.M. (CCH) 339; T.C.M. (RIA) 650065; March 25, 1965
John Enrietto, 135 S. LaSalle St., Chicago, Ill., and Frank C. Niswander, for the petitioners. Theodore W. Hirsh, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined deficiencies in income tax against Middle States Development and Equipment Company (hereinafter sometimes called Middle States) as follows: Fiscal Year Ended January 31
Deficiency
1954
$ 52,077.89
1955
63,131.29
1956
2,047,048.78
1957
36,933.09 In Docket No. 2410-62 respondent determined that Book Production Industries, Inc. was liable *268 as transferee of the assets of Middle States for $1,439,215.47 (plus interest) of the above deficiency. In Docket No. 2571-62 respondent determined that John F. Cuneo was liable as transferee of the assets of Middle States in the amount of $2,199,191.05 (plus interest). In Docket No. 2817-62 respondent determined a deficiency in the income tax of Book Production Industries, Inc. for 1956 in the amount of $378,603.68. In an amendment to his answer the respondent claimed an additional deficiency of $221,325 in the income tax of Book Production Industries, Inc. for 1956. In Docket No. 2849-62 respondent determined a deficiency in the income tax of John F. Cuneo and Julia S. Cuneo for 1956 in the amount of $3,724,756.57. The issues in these consolidated cases are as follows: (1) whether Middle States was completely liquidated within the meaning of section 337 of the Internal Revenue Code of 1954, [1] or whether the liquidation was a step in a reorganization within the meaning of section 368(a)(1)(F); (2) whether Babcock Printing Press Corporation was properly included by Middle States as an affiliate within the meaning of section 141 of the Internal Revenue *269 Code of 1939 and sections 1501 and 1502 of the Internal Revenue Code of 1954 for the taxable years ended January 31, 1954 through 1957; (3) whether certain advances and payments by Middle States to or for the account of Babcock Printing Press Corporation are deductible as worthless or partially worthless business bad debts under section 166 in the taxable years ended January 31, 1956 and 1957; (4) whether the operating loss of Mellody Mills, Inc. for 1956 in the amount of $95,188.75 was properly includable in computing the consolidated net income of Book Production Industries, Inc. and its affiliates for that year; (5) whether certain advances made by Middle States to Mellody Mills, Inc. are deductible as worthless business bad debts under section 166 to the extent of $6.250 and $49,139.49 in the taxable years ended January 31, 1955 and 1956, respectively; and (6) whether Book Production Industries, Inc. realized a gain of $425,625 in 1956 through the transfer to it of certain assets of Babcock Printing Press Corporation. Findings of Fact Some *270 of the facts were stipulated and they are so found. John F. Cuneo and Julia S. Cuneo, husband and wife, are residents of Libertyville, Lake County, Illinois. John F. Cuneo, who maintains his principal office in Chicago, Illinois, filed with his wife a joint Federal income tax return for 1956 with the district director of internal revenue, Chicago, Illinois. Book Production Industries, Inc., hereinafter called Book Production, is an Illinois corporation with its principal office in Chicago, Illinois. During the year 1956 Book Production owned from 85 percent to 100 percent of the outstanding stock of the following corporations: John A. Dickson Publishing Company; A. J. Cox and Company; Basic Books, Inc.; Times Sales Company, Inc.; The Catholic Press, Inc.; Mellody Mills, Inc.; Family Weekly Magazine, Inc.; and The Better Speech Institute of America, Inc. For the year 1956 Book Production and the above corporations filed a consolidated income tax return with the district director of internal revenue, Chicago, Illinois. At all times here relevant, the outstanding capital stock of Book Production consisted of 200,000 shares of common stock. John F. Cuneo held 120,000 (60 percent) *271 of these shares of common stock, with the remaining 40 percent held by trusts for the benefit of the Cuneo children. About the year 1925 Cuneo had acquired a parcel of improved real estate at 151-157 North Michigan Avenue in Chicago. About 1930 Cuneo obtained permission through a special city ordinance to replace the old building on the property with a modern office building, but the building plan was abandoned when local opposition resulted in a repeal of the ordinance. Cuneo remodeled the old building sometime in the middle thirties. In 1949 there were unsuccessful attempts made to sell or lease this corner property to an insurance company. Middle States Development and Equipment Company was incorporated in Illinois on February 13, 1950. Its outstanding stock consisted of 10,000 shares of common stock, with 8,660 shares held by Cuneo and 1,340 shares by Book Production. The Middle States stock owned by Cuneo and Book Production was issued for property contributed to the newly formed corporation as follows: Value for pur-
pose of stock Property contributed
issuance
John F. Cuneo
Real estate: 151-157 No. Michigan Avenue
$1,192,500.00
12-14 West Washington Street
(Chicago) (1/2 interest)
201,250.00
4866-72 No. Sheridan Rd.
69,100.00
70,000 shares of National Tea
Company common stock
2,607,500.00
$4,070,350.00
Book Production
Babcock Printing Press No.
8937 *
$ 540,132.65
Leasehold **
90,600.00
$ 630,732.65
*272 After its formation in February 1950 Middle States attempted unsuccessfully to acquire property adjoining the 151-157 North Michigan Avenue property so that a new building would be erected under existing city ordinances. During this period the Prudential Building was erected close to the 151-157 North Michigan Avenue property. On November 7, 1955, Middle States owned the following parcels of real estate: (a) 151-157 North Michigan Avenue: a five story and basement brick commercial building leased to various parties including Book Production and including a large sign on the south end of the building leased to advertisers. (b) 12-14 West Washington Street (one-half interest): an 11-story and basement brick and stone commercial building under lease to various parties. (c) 65-69 West Van Buren Street (Chicago): a one-story brick building acquired in 1952 and leased to several stores. (d) A one-story *273 brick building comprising about five stores under lease, constructed by Middle States at Lincoln and Peterson Avenues in Chicago. (e) Libertyville Shopping Center: a one-story brick structure constructed by Middle States in Libertyville, Illinois and consisting of about six stores under lease. (f) 2042-50 North Clark Street (Chicago): a one-story brick structure acquired in July 1955, consisting of two stores under lease. The balance sheet of Middle States as of October 31, 1955 showed the following assets: cash, $135,839.16; accounts receivable, $426,661.86; notes receivable, $508,291.33; stocks, $988,572.23; miscellaneous assets, $78,905.40; real estate (including the Mundelein sublease), $2,280,263.57; equipment (the Babcock press and some printing equipment), $325,577.47; furniture and fixtures, $538.91; and an automobile, $2,350.97. The liabilities and capital were as follows: accounts payable, $418,708.41; mortgages, $199,294.83; capital stock, $1,000,000; capital surplus, $1,450,687.19; earned surplus to February 1, 1955, $1,393,102.49; and profit from February 1, 1955 to October 31, 1955, $285,207.98. In the fiscal year ended January 31, 1956 Middle States received *274 gross rentals of about $195,740 from its so-called Loop buildings (151-157 No. Michigan Ave., 12-14 W. Washington St., and 65-69 W. Van Buren St.) out of a total of about $297,750 in gross rentals from all the realty. The net rentals during this period from Loop buildings totaled about $118,870, and the net rentals from all the realty totaled about $171,830. During this same period Middle States received gross rentals of about $58,050 from the lease of the press and printing equipment. On October 31, 1955, the undistributed earnings and profits of Middle States were $1,678,310.47. On November 7, 1955 the board of directors of Middle States recommended and the shareholders adopted a plan of complete liquidation and dissolution of the corporation, stating the following reasons for such action: Following the convening of the meeting, the Directors had a general discussion as to the scope and objects of the corporate business and the manner of its conduct. They were of the opinion that the erection of the Prudential Building and other major devolpments and changes adjacent to this corporation's chief property, and within the area of the activities and projects subsequent to its incorporation *275 in 1950, have now rendered its operations cumbersome, inefficient and economically ineffective. The Directors were further of the opinion that, under the changed conditions, it was desirable that the more liquid assets be converted into cash and that such assets as are not subject to favorable disposition within a short period of time be distributed in kind to the Shareholders; also, that the corporate obligations be paid and that the corporation be then dissolved. In accordance with the liquidation plan Middle States, beginning with the sale of the National Tea Company stock on December 27, 1955 for $8,705,089.60 (basis as of October 31, 1955 listed as $803,792.30), sold, donated or distributed all of its securities, collected, wrote off or transferred all receivables, sold or distributed in kind all physical assets, and discharged or arranged for the assumption by others of all liabilities. All of these events took place prior to November 1, 1956. The Middle States rental properties were disposed of in the following manner: (a) 151-157 North Michigan Avenue, valued at $914,000, was conveyed by deed of October 5, 1956 to Book Production in consideration of two 10-year, 4 percent *276 notes dated September 15, 1956 aggregating $700,000 after allowance for various credits. (b) 12-14 West Washington Street (one-half interest), valued at $100,000, was conveyed pro rata to the stockholders, Cuneo and Book Production, by deed of September 15, 1956. (c) 65-69 West Van Buren Street, valued at $159,802.39, less liabilities including a mortgage assumed, was conveyed to Cuneo by deed of October 5, 1956. (d) Lincoln and Peterson Avenues, valued at $428,052.82 was conveyed, plus tenants' receivables and less accrued taxes, to Milwaukee-Golf Development Corporation by deed dated October 5, 1956 in consideration of two 10-year, 4 percent notes dated September 15, 1956, aggregating $446,663.16. (e) Libertyville Shopping Center, valued at $400,000 was conveyed, plus prepayments and less liabilities, to Milwaukee-Golf Development Corporation by deed dated September 1, 1956 in consideration of two 10-year, 4 percent notes dated September 15, 1956, aggregating $395,373.23. (f) 2042-50 North Clark Street, valued at $130,000, was conveyed to Milwaukee-Golf Development Corporation by deed dated October 5, 1956, in consideration of assumption of liabilities, including mortgage, *277 and two 10-year, 4 percent notes dated September 15, 1956, aggregating $49,856.98. (g) Babcock printing press No. 8937 and accrued rentals were sold to Book Production as of August 31, 1956 at net book values of $294,718.87 and $54,080, respectively, in consideration of two 10-year, 4 percent notes aggregating $348,351.87. (h) Mundelein sublease and accrued rentals were assigned to Book Production as of August 31, 1956 at a value of $30,000 and $32,550, respectively, in consideration of two 10-year, 4 percent notes dated September 15, 1956, aggregating $62,550. On October 24, 1956, Middle States distributed to its shareholders, Cuneo and Book Production, the promissory notes which had been received by Middle States from Milwaukee-Golf Development Corporation and Book Production in connection with the transfers to them of the several parcels of real estate, as well as the Mundelein leasehold and the Babcock printing press. Prior to November 1, 1956, Middle States distributed to its two shareholders pro rata a total of $10,740,413.98 in cash and other assets. In 1951 Rapid Roller Co. (a division of American Processing and Sales Company) purchased about 14 acres of land for a *278 possible factory site at Golf Road and Milwaukee Avenue in the village of Niles, northwest of Chicago. It was later concluded that a better location for the operations of Rapid Roller Co. (which consisted of the manufacture of press rollers) would be in a different area. Early in 1956 land adjoining the 14 acres became available and, for the purpose of constructing a large shopping center, Cuneo acquired additional adjoining parcels of land, aggregating some 58 acres and arranged for the conveyance of the entire property to Milwaukee-Golf Development Corporation. On February 25, 1956, Milwaukee-Golf Development Corporation, hereinafter called Milwaukee-Golf, was incorporated under the laws of the State of Illinois, and on February 27, 1956 the following shares were issued: Stock - $100
par value
Julia S. Cuneo
70 shares
John F. Cuneo, Jr. Income
Trust of April 15, 1952
(John F. Cuneo, Trustee)
70 shares
Consuela Cuneo Income Trust
of November 10, 1950 (John
F. Cuneo, Trustee)
60 shares
Total
200 shares Julia S. Cuneo and the two income trusts paid the amounts of $7,000, $7,000 and $6,000, respectively, to Milwaukee-Golf on September 13, 1956. On *279 September 4, 1956, 2,800 shares of Milwaukee-Golf stock were issued as follows: Julia S. Cuneo, 930 shares; John F. Cuneo, Jr. Income Trust of April 15, 1952, 930 shares; and Consuela Cuneo Income Trust of November 10, 1950, 940 shares. On the same date a journal entry in the books of Milwaukee-Golf showed, among other items, a debit of "Land-Milwaukee & Golf Road" in the amount of $422,181.49 and corresponding credits to capital stock, $280,000 (Julia S. Cuneo, $93,000 and the two income trusts in the amounts of $93,000 and $94,000, respectively) and accounts payable to John F. Cuneo and Rapid Roller Co. in the respective amounts of $54,138.99 and $90,724.37. The land referred to in the journal entry consisted of the contiguous parcels aggregating about 72 acres at Golf Road and Milwaukee Avenue. The journal entry included the explanation that it was "[to] record assets purchased for Milwaukee-Golf Development Corp., transferred from books of John F. Cuneo and Rapid Roller Co." The amounts of $93,000, $93,000 and $94,000 shown as credits in the above entry were reflected on the books of Cuneo as charges to the open accounts of Julia S. Cuneo and the two income trusts. At all times *280 here relevant, Julia S. Cuneo, the John F. Cuneo, Jr. Income Trust of 1952 and the Consuela Cuneo Income Trust of 1950 each had a net worth represented by securities (apart from the Milwaukee-Golf stock) which had a value of approximately one million dollars. In September and October 1956, John F. Cuneo, Jr. was president of Milwaukee-Golf, J. Channon Bowes (Consuela's husband until January 1961) was vice president, and Cuneo was treasurer. Surveys for the shopping center, known as the Golf-Mill Shopping Center, located at Milwaukee Avenue and Golf Road were made in September 1956, test borings in 1956, plans and specifications were completed in March 1957, and construction began soon thereafter. On October 9, 1959 Milwaukee-Golf issued 20,505 additional shares of stock to a trust created on March 11, 1946 for the benefit of the Cuneo children in exchange for stock of Combined Locks Paper Company at a value of $126.65 per share of Milwaukee-Golf stock, which was then credited $2,050,500 to capital stock and $546,500 to capital surplus. On January 5, 1960, 10,253 shares of Milwaukee-Golf stock were issued to Julia at $126.65 per share, which was credited $1,025,300 to capital *281 stock and $273,242.45 to capital surplus. The funds for this additional stock issue to Julia were furnished by Cuneo, and her account was correspondingly changed on his books of account. In March 1957, 12.45 acres of the property at Milwaukee Avenue and Golf Road were sold to Sears Roebuck & Co., which constructed a store on such property. By May 1961 Milwaukee-Golf had expended about 6.2 million dollars on the Golf-Mill Shopping Center. On May 8, 1961 Milwaukee-Golf borrowed $1,500,000 from the Continental Illinois National Bank and Trust Company of Chicago on a demand note at 4 1/2 percent without any guarantees and on May 9 used part of the proceeds to retire all of the 10-year, 4 percent notes which it had issued to Middle States and which had been distributed in the process of liquidation to Middle States shareholders. On August 9, 1961 the Continental loan was increased to $6,000,000 represented by two 4 1/2 percent notes maturing on February 9, 1962. These notes were secured by a pledge of the Combined Locks stock and by a promise to execute, upon request, a first mortgage lien on the Golf-Mill Shopping Center. In December 1961 the Continental notes were paid with the proceeds *282 of a First National Bank of Chicago loan of $6,000,000 on an unsecured 4 1/2 percent demand note with a commitment by the latter bank to grant a first mortgage loan in said amount upon completion of the shopping center. In their joint Federal income tax return for 1956 John F. Cuneo and his wife, Julia, reported $9,295,071.42 as proceeds of the liquidation of Middle States and on that basis reported a long-term capital gain of $7,475,116.70. Respondent determined in Docket No. 2849-62 that $6,484,729.01 of said proceeds was taxable as ordinary dividends. To the extent that the balance of the proceeds exceeded the adjusted basis of the Middle States stock held by Cuneo, respondent determined that such excess represented longterm capital gain to Cuneo in 1956. In its 1956 return Book Production reported $1,438,267.99 as proceeds of the liquidation of Middle States and on that basis reported a long-term capital gain of $898,135.34. Respondent determined in Docket No. 2817-62 that $1,003,410.72 of said proceeds was taxable as ordinary dividends and that the balance of $434,857.27 represented a return of capital to Book Production. In Docket Nos. 2410-62 and 2571-62 (transferee liabilities *283 of Book Production and John F. Cuneo, respectively) respondent shows an increase in Middle States' income for the taxable year ended January 31, 1956, identified as gain realized from the sale of the National Tea Company stock, in the amount of $7,899,990.23. The explanation for this adjustment is as follows: (c) It is held that the purported sale by Middle States Development and Equipment Company of operating assets to Milwaukee Golf Development Corporation constituted a reorganization within the meaning of section 368(a)(1)(F) of the Internal Revenue Code of 1954. Consequently, Middle States Development and Equipment Company was not liquidated within the meaning of section 336 of the Internal Revenue Code of 1954, and section 337 of such code is not applicable to the sales of Middle States Development and Equipment Company. * * * Babcock Printing Press Corporation, hereinafter called Babcock, was incorporated under the laws of Delaware in November 1937. From its incorporation until the sale of its properties on January 3, 1956, Babcock was engaged in the manufacture, improvement, distribution and sale of printing presses, equipment *284 and parts. During the period 1948 to 1956 Babcock manufactured web-fed magazine presses and small sheetfed offset presses. The magazine presses were priced from $800,000 to over $1,000,000 and required from a year to a year and a half to build. Babcock's outstanding stock initially consisted of 10,000 shares of common stock with a par value of $5 per share. On January 1, 1948 these shares were owned, 5,000 shares each, by two trusts created by Cuneo on September 9, 1942 for the benefit of the Cuneo children. On November 19, 1947 Babcock issued 500 shares of its 4 1/2 percent cumulative preferred stock to Book Production for $50,000. On January 2, 1948 Book Production purchased from the two September 9, 1942 trusts the 10,000 shares of Babcock common stock for $25,000. Beginning with the year 1948 Babcock was included in the affiliated group filing consolidated Federal income tax returns with Book Production. This consolidation with Book Production continued until September 30, 1951. The following schedule shows the net losses reported by Babcock, the consolidated net income (including Babcock), and the dividends received credits of Book Production and its affiliated corporations *285 as reported in its returns for the years 1948 through 1951: Babcock net
Consol. net
Dividend Year
(loss)
income remaining
Received credit
1948
($865,982.44)
$959,993.00
$698,416.53
1949
( 548,321.54)
490,232.18
416,697.35
1950
( 54,722.96)
391,756.44
200,444.77
1951
( 117,955.25) *
948,952.26
181,457.18
In March 1948 Babcock's manufacturing operations were moved from New London, Connecticut to Canton, Ohio, at a cost of $127,240.62. It was necessary to move from the New London plant because of its inadequate facilities for assembling the large web-fed presses which Babcock had recently begun to manufacture. Eleven webfed presses in various stages of completion were moved to Canton. Babcock's New London managment did not move to Canton. Less than 12 supervisors and press assemblers, together with an engineering staff of about 60 employees, made the move to Canton, where Babcock was compelled to recruit and train a new working force of about 500 employees. In 1948 and 1949 Babcock was also engaged in a costly program of developing small sheet-fed offset presses. In 1950 Martin Brueshaber became president *286 of Babcock and served in that capacity until his death in March 1953. Brueshaber, who had many years of experience in the printing press field, immediately undertook to reduce costs. He reduced the working force, cut the engineering staff from 60 to 12 or 15, eliminated the production planning department of 20 employees, and made other changes. By 1953 he had eliminated the cost problems and Babcock was well organized and operating efficiently. Babcock's presses were special purpose equipment built for a particular type of magazine or rotogravure supplement and consequently Babcock had difficulties in selling more than one press of a kind. Each of these presses required considerable research and development expense. Book Production made the following advances to Babcock prior to and subsequent to its acquisition of all the capital stock of Babcock in 1948: Year
Amount
Pre-1948
$ 43,231.27 *
1948
75,000.00 **
1949
1,500.00
1950
971,300.00
1951 (prior to 9/30)
64,000.00
Nov. 1951
25,000.00
On October 12, 1950 Babcock issued a 5-year 4 percent *287 note secured by a second mortgage to Book Production in the amount of $1,094,489.77 covering the advances through 1950 and accrued interest of $3,458.50. On January 25, 1954 this note was replaced with a new 4 percent note in the amount of $1,183,489.77, payable in one-third equal installments on January 25, 1961, 1962, and 1963. For the years 1952 through 1956 Book Production reported consolidated net income as the parent of its affiliated corporations as follows: Consolidated taxable
Dividends
income before dividends
received Year
received deduction
deduction
1952
$1,269,740.07
$178,278.52
1953
670,657.88
149,233.28
1954
449,185.15
175,032.94
1955
2,976,500.16
148,843.50
1956
1,692,181.21
147,373.42
On September 30, 1951 Book Production sold all of the outstanding stock of Babcock to Middle States for $75,000. On that date the balance sheet of Babcock showed the following: Assets
Amount
Cash
$ 53,032.76
Receivables, less reserve
52,527.33
Inventories
543,127.99
Damage claim - insurance
34,560.00
Net depreciable assets
551,299.05
Land
8,264.31
Orders in progress
1,227.98
Deferred charges
11,449.37
Total assets
$1,255,488.79
Total assets carried forward
$1,255,488.79
Liabilities and deficit
Accounts payable
$ 125,201.91
Notes & mort. payable *
1,220,305.91
Accrued liabilities
60,110.49
Provision for prior
years taxes
340,762.11
Advance payments received **
1,356,710.34
Common stock
50,000.00
Preferred stock
50,000.00
Total liabilities
$3,203,090.76
Deficit
$1,947,601.97
*288 During the period from January 1, 1948 to January 31, 1954 Babcock sold presses to Cuneo Press, Inc., Cuneo Eastern Press, Inc. (a wholly-owned subsidiary of Cuneo Press, Inc.) and Neo-Gravure Printing Co. (a division of Cuneo Press, Inc.). [2] In addition, Babcock sold presses to W. F. Hall Printing Co., Western Printing and Lithograph Co., Meredith Publishing Co., T. Eaton & Co., Art Color Printing Co., and the United States Department of Justice. Babcock's development suffered severely from a strike which began in August 1952 and was not settled until August or September 1953. It was impossible to finish presses on order and to solicit new *289 business during the strike because Babcock could not give assurance of delivery. The adverse effects of the strike extended over a year after the settlement because presses required a year to a year and a half to build. Charles W. Ginsberg became president of Babcock in May 1953 at an annual salary of $18,000 plus a percentage of profits. Prior to that, Ginsberg had been in charge of manufacturing at Triangle Publications, a large printing and publishing firm with 3,500 employees, at an annual salary of $36,000. After September 30, 1951, when Middle States acquired the Babcock stock, both Babcock and Middle States kept their books and filed income tax returns on an accrual basis and on the basis of a taxable year ending January 31. Babcock and Middle States filed consolidated income tax returns for the taxable years ended January 31, 1952 through 1957. Net operating losses of Babcock in the amounts of $91,293.77 and $75,513.83 were included in the consolidated returns for the taxable years ended January 31, 1952 and 1953. In the taxable years ended January 31, 1954 through 1957 Babcock sustained net operating losses as follows: Taxable year ended
Operating
Net operating January 31
(loss)
Capital gain
(loss)
1954
($123,687.96) *
$ 1,585.58
($ 78,322.79)
1955
( 138,694.97)
8,894.69
( 129,800.28)
1956
( 111,398.90)
341,443.83
230,044.93
1957
( 12,979.14)
( 12,979.14)
*290 From September 1, 1951 through October 26, 1956, Middle States made numerous cash advances and other payments to or for the account of Babcock in the total amount of $1,661,911.25. In respect to the advances made from September 1, 1951 to September 18, 1952 totaling $142,000, Middle States took Babcock's 3 percent note due January 15, 1955. On January 15, 1955 this note was replaced by a 3 percent note due January 15, 1957 in the amount of $340,678.66, which covered all additional net advances made up to January 15, 1955. On January 3, 1956 Babcock sold to The Robed Company, an Ohio corporation wholly unrelated to any of the parties in these proceedings, all of its operating assets subject to the assumption of certain of its liabilities. As part of the consideration, Babcock received from The Robed Company 50,000 shares of Bellanca Aircraft Corp. common stock valued at $22.50 per share. In satisfaction of Babcock's guarantee of assets transferred to The Robed Company, Middle States paid to The Robed Company the *291 amounts of $120,000 and $17,441.59. The balance sheet of Babcock as of January 31, 1956 showed a deficit of $2,067,467.51. After the sale, Babcock discontinued the active conduct of business. The former business of Babcock was thereafter carried on under the name of Babcock Printing Press Company, a division of The Robed Company. On August 29, 1956 Middle States transferred all of the capital stock of Babcock to Cook County Realty Centers, Inc. to preserve the corporate identity of Babcock. On August 30, 1956 Middle States (in the process of liquidation) assigned to Book Production, as one of its stockholders, all of its claim against Babcock, including all future claims. The assets of Babcock as of August 30, 1956 (which had a total value of $935,625) consisted of a note of The Robed Company in the amount of $710,000 dated July 6, 1956 and payable in 10 equal installments beginning January 6, 1957 with interest at 4 1/2 percent; 47,500 shares of Bellanca Aircraft Corp. common stock which were then being quoted at $4.75 per share on the American Stock Exchange; and 2,493 shares of Automatic Washer Co. stock with a nominal value. The liabilities of Babcock to Middle States and Book *292 Production as per its books and records on August 30, 1956 were as follows: Claims of Middle States, in-
cluding guarantee to banks
$1,419,438.50
Claims of Book Production
1,183,489.77
$2,602,928.27
For purposes of the liquidation of Middle States, the above claims of Middle States (which were assigned to Book Production) were valued at $510,000. After August 30, 1956 all of the assets of Babcock were held for the benefit of Book Production as its sole creditor. On January 31, 1956 Middle States determined that its advances to Babcock had become worthless to the extent of $325,000 and charged off said amount on its books. In the consolidated return filed by Middle States and Babcock for the taxable year ended January 31, 1956 this amount ($325,000) was applied against the selling price of Babcock's assets to The Robed Company, thereby reducing Babcock's reported gain on the sale of its assets by $325,000. In its consolidated return filed for the taxable year ended January 31, 1957 Middle States, after making adjustments to the basis of the advances to Babcock on account of Babcock's operating losses included in the consolidated returns for the taxable years *293 ended January 31, 1952 through August 31, 1956, deducted as a bad debt the remainder of its advances to Babcock in the amount of $135,356.09. Respondent determined in Docket No. 2410-62 (Book Production, transferee of the assets of Middle States) and in Docket No. 2571-62 (John F. Cuneo, transferee of the assets of Middle States) that Babcock "was not an affiliate [of Middle States] within the meaning of section 141 of the Internal Revenue Code of 1939 and sections 1501 and 1502 of the Internal Revenue Code of 1954 and therefore the privilege of filing a consolidated return was not available to such corporation" in the taxable years ended January 31, 1954 through 1957. Respondent further determined "that the operating losses of Babcock Printing Press Corporation which were deducted on the consolidated income tax returns for the taxable years ended January 31, 1954, January 31, 1955, January 31, 1956, and January 31, 1957 in the respective amounts of $122,328.71, $133,757.95, $93,936.54 and $12,900.30 are not allowable under the provisions of section 129 of the Internal Revenue Code of 1939 and section 269 of the Internal Revenue Code *294 of 1954." Respondent allowed no deduction to Middle States in the taxable year ended January 31, 1956 on account of partial worthlessness of the Babcock advances, and respondent disallowed the amount of $135,381.06 [3] claimed by Middle States as a bad debt deduction in the taxable year ended January 31, 1957 in connection with the Babcock advances. American Processing and Sales Company, hereinafter called American Processing, was organized in 1941 under the laws of Illinois and has its principal office in Chicago, Illinois. The 4,175 shares of 3 percent cumulative preferred stock ( $100 par value) of American Processing were held by Graphic Arts Industrial Services, Inc., 1,500 shares, and Book Production. 2,675 shares. The 3,855 shares of American Processing common stock were held by Graphic Arts Industrial Services, Inc., 3,800 shares, and a trust dated August 12, 1935 for the benefit of the Cuneo children, 55 shares. All of the capital stock of Graphic Arts Industrial Services, Inc. was owned by Cuneo until its liquidation on or about May 25, 1956. Thereafter *295 all of the shares formerly held by Graphic Arts Industrial Services, Inc. were held by Cuneo. American Processing, directly or through subsidiaries, was principally engaged in the business of processing and distributing, at wholesale and retail, milk and milk products, including ice cream, in Illinois, Wisconsin, Indiana, Ohio and Michigan. American Processing owned and operated in Illinois dairy herds, breeding stock and horses and engaged in small grain farming on leased properties. On or about April 1, 1951 American Processing started a feed division, which purchased, ground and processed grain and other animal feeds and marketed or used the resulting products. Up to September 30, 1952 this division, known as Mellody Mills Division, had constructed a mill building, installed machinery and equipment and accumulated an inventory. Most of its sales had been to the Farms Division of American Processing, known as Hawthorn-Mellody Farms. In September 1952 a union filed a petition with the National Labor Relations Board for an election to represent employees of the Mellody Mills Division. A labor relations counsellor advised Cuneo to incorporate Mellody Mills Division and to separate *296 it entirely from American Processing. It was his view that, because Mellody Mills Division was engaged only in intrastate commerce, it could be separated from the divisions of American Processing engaged in interstate commerce and that, under existing criteria, the Board would not assume jurisdiction to order an election. Mellody Mills, Inc. was incorporated under the laws of Illinois on October 16, 1952 and acquired at book value the assets and assumed the liabilities of Mellody Mills Division as of September 30, 1952. The net assets of Mellody Mills Division totaled $235,803.96 on September 30, 1952. The consideration for the above transfer was an open account entered on the books of American Processing as vendor and on the books of Mellody Mills, Inc. as purchaser. Mellody Mills, Inc. issued 50 shares of common stock (all of its outstanding stock) to Book Production for $5,000. Subsequently, the National Labor Relations Board ordered that an election be held among the employees of Mellody Mills, Inc. The union lost the election. From the date of its incorporation to December 31, 1956 the feed sales of Mellody Mills, Inc. to the Hawthorn-Mellody Farms were approximately 61 *297 percent of its total sales of $1,216,182.86. Over the same period Book Production made the following advances to Mellody Mills, Inc.: 1953, $60,000; 1954, $9,312.50; 1955, $18,000; and 1956, $19,059.96. Mellody Mills, Inc. incurred the following net losses after its incorporation: Year
Net (loss)
1952 (3 mo.)
$ ( 44,697.70)
1953
( 87,705.65)
1954
(113,949.86)
1955
(300,345.23)
1956
( 95,185.75)
In September 1955 a fire destroyed the principal mill, machinery and equipment of Mellody Mills, Inc., and the total loss sustained by the corporation amounted to $193,208.57. The insurance proceeds amounted to $25,624.95, leaving an uncompensated loss of $167,583.62. It was not considered feasible to incur the large expense of reconstructing the mill, and after September 1955 the business of Mellody Mills, Inc. was reduced to warehousing feed for General Mills and Hawthorn-Mellody Farms, and to the sale of dog food which was produced elsewhere. The book value of the assets of Mellody Mills, Inc. as of December 31, 1955 amounted to $90,457.91. During the years 1952 through 1955 (prior to the fire) Middle States made a series of advances to and for the account *298 of Mellody Mills, Inc. on open account. On December 31, 1955 the outstanding balance of these advances amounted to $55,389.49. During this same period American Processing also made a series of advances to Mellody Mills, Inc., and the balances in this account as of the end of the years 1952 through 1956 were as follows: Year
Balance
1952
$149,492.94
1953
273,378.12
1954
329,913.32
1955
425,994.99
1956
496,301.93
In November 1959 Mellody Mills, Inc. discountinued all business activity, sold its remaining operating assets and transferred all proceeds to American Processing under a claim of lien therefor. On December 31, 1954 the balance of the advances made by Middle States to Mellody Mills, Inc. was in the amount of $55,235.49. As of that date the total liabilities of Mellody Mills, Inc. ($494,410.71) exceeded its total assets ($253,057.50) by the amount of $241,353.21. In its return for the taxable year ended January 31, 1955 Middle States deducted a portion ($6,250) of its advances to Mellody Mills, Inc. as a partially worthless bad debt in that taxable year. In its return for the taxable year ended January 31, 1956 Middle States deducted as a bad debt *299 the amount of $49,139.49, representing the balance of the account due from Mellody Mills, Inc. Respondent disallowed the bad debt deductions claimed by Middle States in the fiscal years ended January 31, 1955 and 1956 in connection with its advances to Mellody Mills, Inc. (Docket Nos. 2410-62 and 2571-62). Book Production filed consolidated income tax returns with Mellody Mills, Inc. and other affiliated corporations for the years 1952 through 1956. In Docket No. 2817-62 respondent determined that the net operating loss of Mellody Mills, Inc. for 1956 in the amount of $95,188.75 [4] was not allowable for the purpose of computing the consolidated taxable income of Book Production for that year. Opinion The first issue relates to the liquidation of Middle States. Petitioners claim that, following the adoption of a plan of liquidation on November 7, 1955, Middle States was completely liquidated within 12 months; that under section 337 of the Internal Revenue Code 1954 the gain of about $7,900,000 realized by Middle States from the sale of *300 the National Tea Company stock in December 1955 is not recognized; that the distributions made by Middle States to its stockholders John F. Cuneo and Book Production in the respective amounts of $9,301,198.51 and $1,439,215.47 were liquidating distributions under section 331; and that the gains realized by Cuneo and Book Production in 1956 in the respective amounts of $7,475,116.70 and $898,135.34 are taxable as capital gains. Respondent sees the transactions in another light. He argues that the various intergrated steps, including the transfer of some of its real estate by Middle States to Milwaukee-Golf, accomplished nothing more than a liquidation and reincorporation of Middle States that qualifies as a section 368(a)(1)(F) reorganization; that the gains realized from the sale of its assets by Middle States during the 12-month period of liquidation do not qualify under the nonrecognition provisions of section 337, and that the distribution made by Middle States to its stockholders, Cuneo and Book Production, must be treated as "boot" received in a reorganization taxable as a dividend distribution. Section 368(a)(1) defines six types of reorganizations in subparagraphs (A) through *301 (F). Respondent relies entirely on subparagraph (F), which defines a reorganization as "a mere change in identity, form, or place of organization, however effected." In Lewis v. Commissioner, 176 F. 2d 646, it was stated that "'the essence of [a statutory reorganization] is a continuance of the proprietary interests in the continuing enterprise under modified corporate form, the transaction being deemed insufficiently closed economically to justify a tax at the time, except in so far as the stockholder gets something in addition to stock or securities in the reorganized company.'" To show that the continuing enterprise requirement is satisfied here, the respondent argues that Middle States, prior to its liquidation, was in the shopping center business and that as a result of the transfer by Middle States to Milwaukee-Golf for promissory notes of the Lincoln and Peterson Avenue property, the Libertyville Shopping Center, and the 2042-50 North Clark Street property, Milwaukee-Golf merely continued this shopping center business. We cannot accept respondent's characterization of the Middle States business operations. When Middle States was formed in 1950, Cuneo contributed *302 three parcels of real estate with a value of $1,462,850 and National Tea Company stock with a value of $2,607,500 to the new corporation. One of the properties, a five-story commercial building, was in downtown Chicago at 151-157 North Michigan Avenue and valued at $1,192,500; another of the properties was a half-interest in an 11-story commercial building also in downtown Chicago (12-14 West Washington Street) and valued at $201,250; while the last property contributed was on North Sheridan Road and valued at $69,100. When Middle States was organized it was planned to acquire property adjoining the North Michigan Avenue property for the purpose of erecting a large office building. This plan did not prove feasible and by 1955 it was decided to liquidate Middle States. When Middle States adopted its plan of liquidation in November 1955 it owned six parcels of real estate. In addition to the property on North Michigan Avene and the one-half interest in the 11-story building, Middle States owned a one-story building in downtown Chicago (65-69 West Van Buren Street) and the three properties later transferred to Milwaukee-Golf. In the taxable year ended January 31, 1956, Middle States *303 received gross rental income of about $195,740 from its three commercial buildings in downtown Chicago out of a total of about $297,750 in gross rentals from all its realty. In this same period Middle States also received gross rentals of about $58,050 from the lease of press and printing equipment. Even if we should agree that the three properties transferred to Milwaukee-Golf were shopping centers, [5] it is difficult to accept respondent's contention that a corporation that receives about 65 percent of its gross realty rentals from property other than shopping centers is nonetheless chiefly engaged in the shopping center business, or that these three properties are the "essential assets of the business" with the rest dismissed as nonessential to the business operations of Middle States. It is also significant that the value at the time of liquidation of *304 these various commercial properties that are deemed by respondent as nonessential to Middle States' operations exceeded the value of the three purported shopping centers. In fact, the value of the property on North Michigan Avenue was placed at $914,000 when it was distributed to Book Production (one of the two stockholders of Middle States) in October 1956, which nearly equals the combined value ($958,052.82) of the three properties transferred to Milwaukee-Golf. Middle States' income, apart from the substantial dividends, came mostly from rentals of its several real properties. We can perceive no justification for making an artificial distinction between the rentals received from the commercial buildings and the rentals received from the three purported shoping centers. Whether we emphasize source of revenue or valuation, it would seem that the three commercial buildings, which respondent would have us treat as nonessential, assume an importance in Middle States' business operations equal to (if not greater than) the three properties designated by respondent as shopping centers. We also find it difficult to regard Milwaukee-Golf as simply a continuation of the operations of the *305 old corporation, Middle States, or, in the statutory language, "a mere change in identity, form, or place of organization" within the meaning of section 368(a)(1)(F) when we consider that even before the liquidation of Middle States by October 31, 1956, Milwaukee-Golf had undertaken surveys for a large new shopping center that by May 1961 had involved an expenditure of approximately $6,200,000. In 1961, when it had completed five large buildings, Milwaukee-Golf made substantial bank loans and by 1963 several additional buildings had been completed on the shopping center site. Respondent's argument also founders on its other major premise, i.e., that the stockholders of the old corporation, Middle States (Cuneo and Book Production) continued to have an equity interest in the new corporation, Milwaukee-Golf. Respondent recognizes on brief that a section 368(a)(1)(F) reorganization requires "that the shareholders [of the old corporation] continue to have a substantial and definite equity interest in the new corporation." See Lewis v. Commissioner, supra. In Southwell Combing Co., 30 T.C. 487, 498, this Court stated that "[inherent] in the concept of 'reorganization' *306 as used in the statute is that there must be a real continuity of interest in the owners of the old corporation and the owners of the new." At all times here relevant Cuneo held 86.6 percent and Book Production the remaining 13.4 percent of the stock of Middle States. Neither Cuneo nor Book Production ever held any stock in the new corporation, Milwaukee-Golf. Instead, all of the stock in Milwaukee-Golf was owned by Julia S. Cuneo and certain trusts for the benefit of the Cuneo children. Upon its incorporation in February 1956 Milwaukee-Golf issued 200 shares of stock to Julia and the two income trusts and accounts receivable were set up on the corporation's books for $20,000 as payment for the stock. This amount was paid by the parties to the corporation in September 1956. In that same month Milwaukee-Golf issued 2,800 additional shares in the amount of $280,000 to the same stockholders. In October 1959 the corporation issued 20,505 shares to one of the trusts for the benefit of the Cuneo children in exchange for certain corporate stock valued at $2,050,500. In January 1960 the corporation issued 10,253 shares to Julia at $126.65 per share, or a total of $1,298,542.45. In the *307 face of all this, respondent argues that Cuneo had an "equity" interest of at least 72 percent in Milwaukee-Golf and that for purposes of section 368(a)(1)(F) it is this interest which controls in determining whether the stockholders of the old corporation continued their proprietary interest in the new. Respondent reasons thus: The primary assets acquired by Milwaukee-Golf in 1956 were (1) the three shopping centers ($891,893.37) from Middle States for 10 year promissory notes; (2) the 58 acres of land ($334,138.99) for a note to John F. Cuneo in the amount of $54,138.99 and stock issued in the amount of $280,000; and (3) the 14 acres of land ($90,724.37) for a note to Rapid Roller Co. Of these total assets in the amount of $1,316,756.73 an amount equal to 72 percent thereof was represented by notes payable to John F. Cuneo and Middle States, and that this 72 percent was actually equity capital in the corporation of Milwaukee-Golf. Therefore, since Cuneo owned nearly 87 percent of the stock in Middle States and his interest in the newly created corporation, Milwaukee-Golf, was at least 72 percent "after the reincorporation", it follows that nothing more than an adjustment in the same *308 business venture occurred. We cannot accept respondent's contention. It is well established that, in the area of statutory reorganizations, notes or other evidences of indebtedness cannot be equated with a proprietary interest, and this is true whether the indebtedness consists of shortterm notes or long-term bonds. Le Tulle v. Scofield, 308 U.S. 415. Respondent relies on the "thin incorporation" cases to show that the advances made by Cuneo to Milwaukee-Golf in return for notes really represented equity, not debt. We think those authorities are not applicable under these facts. A comparison of the notes given by Milwaukee-Golf for its properties with the $300,000 in Milwaukee-Golf stock issued to Julia and the trusts in 1956 does not demonstrate an unfavorable debt-equity ratio. See Ruspyn Corp., 18 T.C. 769. We note also that the 10-year promissory notes given by Milwaukee-Golf to Middle States (and later distributed to stockholders in liquidation) were paid off by Milwaukee-Golf in 1961. We do not agree with respondent that the $300,000 equity ownership in Milwaukee-Golf is "not of great significance." We recognize that the $280,000 credited in September *309 1956 to the capital stock accounts of the three stockholders was keyed to the transfer of about 72 acres of land by Cuneo and a related corporation to Milwaukee-Golf. But the amount of $280,000 was treated on Cuneo's books as an indebtedness from Julia and the two income trusts, who were certainly able to meet this indebtedness since all three had a net worth represented by securities valued at approximately $1,000,000. Cuneo testified that the trusts eventually paid this indebtedness in full and he explained that Julia had not paid her indebtedness to him "because she has got some securities, if she sells them now she will lose money." We do not believe that there was anything spurious about these obligations. Although intra-family dealings may, at times, call for close scrutiny to determine the bona fides of a transaction, we are satisfied that on the basis of this record the true ownership of the Milwaukee-Golf stock was in Julia and the trusts and that this stock represented the sole equity in the new corporation. In Pridemark, Inc., 42 T.C. 510, all of the "essential operating assets" of the business of the old corporation (selling prefabricated houses) were carried *310 over to the new corporation, which then continued the same business activity with a new manufacturing supplier. All of the stock of both the old and the new corporations was in the same hands. Under those facts we found "both continuity of ownership and continuity in the field of business activity" and held that the transactions constituted a reorganization both within the letter and spirit of section 368(a)(1)(F). In the present case, realty amounting to less than one-half of the value of old corporation's realty operating assets was transferred to the new corporation, all of whose stock was held by new stockholders. We do not believe that Pridemark, Inc., supra, is applicable here. In Joseph C. Gallagher, 39 T.C. 144, the operating assets of the old corporation were transferred to a new corporation and the same business continued uninterruptedly, but only 72 2/3 percent of the new corporation's stock was owned by former stockholders of the old corporation. This Court, after finding that there was no reorganization under subsections (C), (D) and (E) of section 368(a)(1), stated that "the shift that occurred in the proprietary interest of the two corporations *311 was hardly the 'mere change in identity, form, or place of organization' * * * required by subsection (F)." Here, of course, the old proprietary interest disappeared completely. It should also be pointed out that even if we were to accept respondent's theory that the 10-year notes held by Cuneo represented an equity interest in the new corporation, Milwaukee-Golf, it would only give Cuneo a 72 percent equity interest in the new corporation, approximately the same shift in proprietary interest that was involved in the Gallagher case. [6]
We find, and so hold, that (1) Middle States was completely liquidated within the *312 12-month period following November 7, 1955, and that under section 337 the gains realized from the sale of its assets are not recognized; and (2) the distributions made by Middle States to its stockholders, Cuneo and Book Production, in the respective amounts of $9,301,198.51 and $1,439,215.47 were liquidating distributions under section 331 and that the gains realized by them in connection with such liquidating distributions are taxable to them as capital gains. The next issue is whether the net operating loss of Mellody Mills, Inc. for 1956 in the amount of $95,185.75 was properly includable in the consolidated return filed by Book Production and its affiliates for that year. Respondent determined in Docket No. 2817-62 (Book Production) that this loss was "not * * * allowable for the purpose of determining consolidated taxable income." Respondent gives the following reasons for the disallowance: (1) there was insufficient equity ownership in Mellody Mills, Inc. by Book Production to meet the statutory requirements for affiliation under section 1504; this argument depends upon treating certain advances made to Mellody Mills, Inc. by American Processing as capital contributions rather *313 than loans; (2) the acquisition of Mellody Mills, Inc. by Book Production in 1952 was without the requisite business purpose to support an affiliation within the meaning of sections 1501-1504; and (3) Book Production acquired Mellody Mills, Inc. for purpose of tax avoidance within the meaning of section 129 of the Internal Revenue Code of 1939 or section 269 of the Internal Revenue Code of 1954. We are inclined to agree with respondent that Book Production, with its token investment of $5,000 in Mellody Mills in 1952, did not have sufficient equity interest in Mellody Mills to meet the stock affiliation requirements of the statute. When this nominal investment is contrasted with the continuing advances of substantial sums (reaching a balance of $496,301.93 by the end of 1956) by American Processing to Mellody Mills, the said advances have all of the earmarks of capital contributions - and hence could constitute another class of stock. However, since the record amply supports respondent's second argument, i.e., the lack of the requisite business purpose for affiliation, we need not go into the other arguments on their merits. In Naeter Brothers Publishing *314 Co. 42 T.C. 1, we stated that "[the] rule of a number of cases of this and other courts is that even though proper connection through stock ownership is shown, a business purpose must be shown for an affiliation before the acquired corporation can be treated as a member of the affiliated group." J.D. & A. B. Spreckles Co., 41 B.T.A. 370; Elko Realty Co., 29 T.C. 1012, affd. per curiam 260 F. 2d 949; R. P. Collins & Co., Inc., v. United States, 303 F. 2d 142. Under the facts of this case it is difficult to perceive the requisite business purpose for treating Mellody Mills as a member of the affiliated group. American Processing [7] was engaged in processing and distributing milk and milk products at both wholesale and retail, and in connection with these operations owned and operated dairy herds, breeding stock and horses and engaged in small grain farming on leased properties. In April 1951 American Processing started a feed division, known as the Mellody Mills Division, which purchased, ground and processed grain and other animal feeds and marketed or used the resulting products. By September 1952 the division had *315 constructed a mill building, had installed machinery and equipment and had acquired an inventory. Most of its sales had been to a division of American Processing known as Hawthorn-Mellody Farms. In October 1952 Mellody Mills was incorporated and the net assets of the Mellody Mills Division, amounting to approximately $235,800, were transferred to the new corporation. The consideration for this transfer was an open account on the books of American Processing as vendor and on the books of Mellody Mills as purchaser. All of the outstanding stock of Mellody Mills (50 shares) was then issued to Book Production for $5,000. From the incorporation of Mellody Mills through 1956, about 61 percent of its total feed sales of $1,216,182.86 were made to Hawthorn-Mellody Farms. Mellody Mills incurred net losses after its incorporation as follows: *316 1952 (3 months), $44,697.70; 1953, $87,705.65; 1954, $113,949.86; 1955, $300,345.23; and 1956, $95,185.75. [8]
During the years 1952 through 1955 American Processing made substantial advances to Mellody Mills. At the end of *317 1952 the balance of these advances was $149,492.94 and by the end of 1956 this balance stood at $496,301.93. Book Production made advances to Mellody Mills in the years 1953 through 1956 in the respective amounts of $60,000, $9,312.50, $18,000 and $19,059.96. Middle States also made payments to Mellody Mills during this period. It is thus apparent that the operations of Mellody Mills were at all times primarily oriented toward American Processing, which continued to receive much of its feed supplies from Mellody Mills and continually advanced substantial sums for its operations. It does not appear that any serious effort was ever made to operate Mellody Mills at a profit, and, in fact, the mounting operating losses of that corporation indicate otherwise. Book Production, which controlled some eight companies engaged primarily in the publishing and printing fields, gives as its sole reason for the acquisition of Mellody Mills in 1952 the avoidance of labor difficulties which threatened when Mellody Mills was being operated as a division of American Processing. There was testimony that an effort was being made in September 1952 to unionize the employees of the Mellody Mills Division *318 of American Processing and that a labor consultant advised that this division be separated from American Processing. The testimony of the labor consultant was not very clear, but we gather that the ostensible reasons for separating this division from American Processing was to avoid the jurisdiction of the National Labor Relations Board and to keep the extensive farm, which was also operated by American Processing, from being organized as a unit together with the Mellody Mills Division. At any rate, this advice did not work, for the National Labor Relations Board ordered an election among the employees of Mellody Mills which ultimately proved unsuccessful for the union. None of this helps Book Production. It does not even remotely establish a business purpose for the acquisition and treatment of Mellody Mills by Book Production as a member of the affiliated group. The labor consultant only testified that he "advised them to make it [the Mellody Mills Division] a separate corporation." We do not see how this advice, given to avoid a union drive against Mellody Mills and perhaps even American Processing, can be transferred into a business purpose for the affiliation of Mellody Mills *319 with Book Production within the intent of the statute. The real reason for this particular arrangement devised by the parties is suggested by the tax benefits that would flow from it. American Processing continued to make heavy advances to Mellody Mills during the years 1952-1956 when it was a subsidiary of Book Production, and, as we have seen, Mellody Mills had substantial operating losses during the period. If Mellody Mills were operated as a division of American Processing, these losses would, of course, reduce the taxable income of American Processing, and, of course, there would be no additional deduction for the advances to the division. This would also be true if Mellody Mills were operated as a subsidiary of American Processing. This is so because the regulations under the consolidated returns section of both the 1939 and 1954 Codes provide that no bad debt deduction for advances by a parent to subsidiaries are allowed during the period of consolidation, and even after the period of consolidation the bad debt loss would, generally, have to be reduced by the losses of the subsidiary availed of during the consolidated period. Regs. 129, sec. 24.40; sec. 1.1502-40, Income Tax Regs. *320 However, the provisions of these regulations could be avoided by the device used here, since the losses of Mellody Mills could be availed of on the consolidated return filed by its parent, Book Production, and at the same time the advances made by American Processing could be deducted in full when worthless or partially worthless without any reduction for the operating losses incurred by Mellody Mills. Nor would American Processing have to wait until the termination of the consolidated period in order to claim a deduction for the partial worthlessness of an advance to Mellody Mills. [9]
*321 It appears that American Processing, at the close of its fiscal year March 31, 1956, actually did charge off as a provision for bad debts the sum of $405,227.95, representing 90 percent of the balance of its open account with Mellody Mills which amounted to $450,253.28, and American Processing deducted the amount of $405,227.95 in its income tax return as a partially worthless debt. [10] In this connection, it should also be noted that a similar pattern occurred in the transactions (which we shall discuss later in this opinion) by which Babcock, a loss corporation which had been a subsidiary included in the consolidated returns of Book Production for the years 1948 through 1951, was transferred to Middle States and was then included in the consolidated returns of Middle States and its affiliates through 1957. Prior to 1952, Book Production had made sizeable advances to Babcock (in excess of $1,000,000) and in 1953, 1954 and 1955, after Babcock was no longer a subsidiary included in the consolidated returns of Book Production, the latter corporation claimed deductions for partial worthlessness of its claims against Babcock. *322 We find, and so hold, that Mellody Mills was not a member of the Book Production affiliated group within the intent of sections 1501-1504 and that, consequently, its operating loss for 1956 was not allowable for the purpose of computing the consolidated taxable income for that year of Book Production and its affiliates. The next issue is whether the net operating losses of Babcock for the taxable years ended January 31, 1954 through 1957 in the respective amounts of $122,328.71, $133,757.95, $93,936.54 and $12,900.30 were properly includable in the consolidated returns filed for those taxable years by Middle States and its affiliated corporations. The issue is similar to the one above involving Mellody Mills and Book Production, and respondent here makes the same three major arguments as in the prior issue. We agree with respondent's argument that the acquisition lacked the requisite business purpose to support an affiliation within the meaning of the consolidated return provisions, and we do not reach the other arguments. It is argued that Middle States acquired Babcock from Book Production in September 1951 for the following business reasons: (1) Babcock manufactured printing *323 presses and when it became known to the printing trade that Babcock was owned by a Cuneo-controlled corporation (Book Production) there developed sales resistance among printers competing with Cuneo Press, Inc., another Cuneo-controlled corporation. Therefore, to overcome this sales resistance, Babcock was transferred to Middle States; (2) Book Production wanted to increase its loans from an insurance company by $600,000 to finance the acquisition of the Atheneum Press, and to obtain this increased loan it was thought desirable to remove Babcock which was losing money and had an unfavorable balance sheet, from the consolidated balance sheet; and (3) Cuneo thought that Middle States "could develop its business and stimulate Babcock's sales by assisting Babcock customers by leasing presses." On the record before us, we think these arguments are unconvincing and lacking in substance. There is no persuasive evidence to show that any real efforts were made after 1951 to make any serious changes in Babcock's sales pattern. During most of the period here relevant a large portion of the Babcock sale was made to the Cuneo Press, Inc., Cuneo Eastern Press, Inc. (a wholly-owned subsidiary of *324 Cuneo Press, Inc.) and Neo-Gravure Printing Co. (a division of Cuneo Press, Inc.). The evidence reveals that most of these sales throughout the years 1948 through 1953 were made at a loss. In fact, the history of Babcock from 1948 through 1957 showed nothing but losses of impressive magnitude: Year
(Loss)
1948
$ (865,982.49)
1949
(548,321.54)
1950
( 54,722.96)
1951
(117,955.25) (To Sept.
30, 1951)
Fiscal Year
Ended 1/31
1952
( 91,293.77)
1953
( 75,513.83)
1954
(123,687.96)
1955
(138,694.97)
1956
(111,398.90)
1957
( 12,979.14)
It would appear from this record that paramount concern was to supply printing equipment to the other Cuneo companies, and the efforts made by Babcock to cut its costs and to make its operations more efficient is certainly not inconsistent with their primary concern. We also note that when Babcock was sold in January 1956 to an outside corporation it managed to make some profit. With this background, we cannot believe that the transfer of Babcock in 1951 from Book Production to Middle States was promoted by the desire to camouflage the true ownership of Babcock from the printers who were in competition with the Cuneo *325 Press, Inc., or that in some manner Middle States (which was engaged primarily in the real estate field) would improve its business and improve Babcock's sales by leasing presses to potential customers of Babcock. In connection with the argument that Babcock was transferred from Book Production to Middle States in order to improve the balance sheet of Book Production, which was desirous of obtaining an additional $600,000 loan to acquire the Atheneum Press, we cannot understand how this can be regarded as a business reason of either Middle States or Babcock. Moreover, about all we have on this argument is the testimony of a witness who from 1948 to 1956 was a director and secretary of Babcock, that "we felt it would be desirable and almost essential to remove that burden [Babcock] from the Book Production Industries consolidated balance sheet, and for that reason, Book Production Industries wanted to sell Babcock stock." It also appears that Book Production had contracted to buy the Atheneum Pres in 1949 and that the purchase was closed at the end of that year, while the transfer of Babcock to Middle States did not occur until late in 1951. As in the issue concerning Mellody *326 Mills, we feel that the true reason for the transfer of Babcock to Middle States is suggested by the tax benefits that would be made available. The pattern we observed above in connection with Mellody Mills issue reappears here. Book Production had filed consolidated returns with Babcock from 1948 until 1951 and during this period Babcock's losses of $1,586,982.19 were availed of by Book Production in these returns. During the same period Book Production had made advances to Babcock totaling $1,155,031.27. Babcock was transferred by Book Production to Middle States in September 1951. In 1953 Book Production claimed a deduction of $400,000 in its income tax return for the partial worthlessness of its claims against Babcock, and further deductions were claimed by Book Production in its returns for 1954 and 1955 in the respective amounts of $400,000 and $133,489.77 for partial worthlessness of its claims against Babcock. [11] We see no purpose in again repeating the prohibitions and limitations upon claims for bad debts imposed by the consolidated returns regulations upon affiliated companies. We are persuaded that the device of shifting Babcock from Book Production to Middle States for *327 no authentic business reason in 1951 was conceived for the purpose of circumventing these regulations. No suggestion is made by any of the petitioners that these regulations under the 1939 and 1954 Internal Revenue Codes were invalid. Petitioner makes brief reference to The Zanesville Investment Co. v. Commissioner, 335 F. 2d 507, reversing our opinion in 38 T.C. 406. However, the factual patern before us as outlined above is materially different from that in the Zanesville case and that case is not applicable here. In Zanesville, the conclusion is based largely on the ground that there was one business unit which was entitled to an economic loss it had clearly suffered. Here we have two affiliated groups with Book *328 Production and Middle States (both controlled by Cuneo) as parents. By transferring a subsidiary from one to the other, one economic loss is in effect used to support two deductions. We find, and so hold, that Babcock was not an affiliate of Middle States within the intent of sections 1501-1504 of the Internal Revenue Code of 1954 and that, consequently, its operating losses for the taxable years ended January 31, 1954 through 1957 were not allowable for the purpose of computing the taxable income of Middle States for those years. The next issue is whether Middle States is entitled to bad debt deductions under section 166 in its taxable years ended January 31, 1956 and 1957 in connection with advances and payments it made to or for its subsidiary, Babcock, over the period from September 1, 1951 through October 26, 1956. Respondent's chief argument seems to be that the advances were made with no real hope of repayment and that consequently no valid debtor-creditor relationship arose between Middle States and Babcock which would support a bad debt deduction. We cannot agree. The advances were treated as debts of Babcock on the books of the parties, and there *329 was testimony as to the expectation of repayment when the advances were made. Only a relatively small portion of the advances was used to acquire plant, property or equipment. Babcock gave a note dated January 15, 1953 to Middle States in the amount of $142,000 due January 15, 1955 with interest at 3 percent covering the advances up to then. This was replaced by a note on January 15, 1955 for $340,678.66 which covered the original amount of advance plus additional advances after that date, but reduced by a repayment of $300,000 made by Babcock. Some of the advances were on open account but this in itself is not decisive. We note also that of the total net advances of $1,661,911.25 made by Middle States to Babcock during the period from September 1, 1951 through October 26, 1956, more than $1,000,000 of the payments were made after Babcock sold its assets on January 3, 1956 and these payments were made under guarantees of loans and other obligations of Babcock which had been previously undertaken by Middle States. Such payments must, under the rationale of Putnam v. Commissioner, 352 U.S. 82, give rise to debts. Respondent, to support his contention that the advances *330 did not create a true debtor-creditor relationship, makes much of the insolvency of Babcock during these years and its recurring operating losses. We have, of course, considered these factors. However, they must be viewed against the background of certain events in Babcock's history, namely, the move from New London, Connecticut, to Canton, Ohio, just a few years prior to 1951, with the resulting need of recruiting and training a new work force, and the strike in 1952 and 1953 which seriously hampered Babcock's operations. We cannot say that Babcock's insolvency and losses under these circumstances can support respondent's contention that the Middle States advances were made without expectation of repayment. Whether or not the advances were intended as loans, or were actually something else, is a question of fact. We have considered the court-developed criteria which have evolved in this area ( Sam Schnitzer, 13 T.C. 43, affd. 183 F. 2d 70; see also O. H. Kruse Grain & Milling v. Commissioner, 279 F. 2d 123) and we find, and so hold, that the advances were in fact intended as loans whose worthlessness would properly give rise to bad debt deductions *331 under section 166. The next issue is whether Middle States is entitled to bad debt deductions under section 166 in the taxable years ended January 31, 1955 and 1956 in connection with advances made to Mellody Mills (a subsidiary of Book Production) from September 1952 to September 1955. Respondent disallowed the deductions of $6,250 and $49,139.49 for the taxable years ended January 31, 1955 and 1956, respectively, on the ground that "it has not been established that any portion of such amounts was allowable under the provisions of section 166 of the Internal Revenue Code of 1954." Respondent again argues that no bona fide debt ever existed between Middle State and Mellody Mills because "the advances in question were worthless when made and there would be no hope or expectation of repayment" and that "[the] complete absence of the possibility of repayment of the advances by Middle States to Mellody Mills was such that no deduction for bad debts can be sustained." But we do not reach these contentions because even assuming the debts were valid, we do not believe that the petitioners, on this record, have established the partial worthlessness or worthlessness *332 of the debts in the taxable years involved. To justify the partial write-off in the amount of $6,250 of the Mellody Mills obligations to Middle States in the taxable year ended January 31, 1955, Middle States does little more than point to the total obligations of Mellody Mills as of the end of 1954, which exceeded its total assets, and thereupon concludes that the Mellody Mills account could never be collected in full. We notice, however, that this same situation, i.e., an excess of liabilities over assets, similarly existed on the Mellody Mills balance sheet, not only at the end of 1954, but also at the end of 1952 and 1953. We also note that, at the end of 1954, the current liabilities amounted to $494,410.71 and the major portion of this total consisted of the accounts payable by Mellody Mills to American Processing, another Cuneo-controlled corporation, in the amount of $329,943.32. As for the bad debt deduction in the taxable year ended January 31, 1956 by Middle States of the balance of its obligation from Mellody Mills, Middle States merely calls our atention to the fire in September 1955 which destroyed the principal mill, machinery and equipment of Mellody Mills. But *333 the record shows that after September 1955 Mellody Mills engaged in the business of warehousing feed for General Mills and also for the farm division of American Processing and, in addition, went into the dog food business. It is also stipulated that Mellody Mills did not discontinue all business activity until November 1959, at which time it sold all of its remaining operating assets. We cannot find, on the basis of this evidence, that Middle States has established the worthlessness or partial worthlessness of the Mellody Mills obligations in the taxable years ended January 31, 1955 and 1956. We sustain the respondent on this issue. Respondent, in an amendment to his answer in Docket No. 2817-62 (Book Production), claimed an additional deficiency in Book Production's income tax for 1956 in the amount of $221,325. Respondent alleged in his amended answer (filed on the first day of the trial) that "[on] or about August 30, 1956, [Book Production] received for its benefit from Babcock Printing Press Corporation assets having a value of at least $425,625.00)" and "[that] by virtue of the aforesaid, [Book Production] realized a gain in the amount of at least $425,625.00 in *334 the taxable year 1956." Respondent has the burden of proof on this issue. Book Production and Cuneo were the two stockholders of Middle States which controlled Babcock. In January 1956 Babcock sold all of its operating assets to The Robed Company, an unrelated corporation, and Babcock then discontinued the active conduct of business. On August 30, 1956 the outstanding claims of Middle States and Book Production against Babcock were in the respective amounts of $1,419,438.50 and $1,183,489.77, or a total of $2,602,928.27. Babcock's assets, as of August 30, 1956, consisted of a promissory note dated July 6, 1956 of The Robed Company in the amount of $710,000 and payable in 10 semiannual installments of $71,000 beginning January 6, 1957, with interest at 4 1/2 percent, and 47,500 shares of Bellanca Aircraft Corp. common stock then being quoted at $4.75 per share on the American Stock Exchange. [12] On August 30, 1956 Middle States (then in the process of complete liquidation) assigned to Book Production (one of its stockholders) all of its claims against Babcock. The stipulation of the parties states that on August 29, 1956 "all of the stock of Babcock was transferred to Cook County *335 Realty Centers, Inc., so as to preserve the corporate identity of Babcock" and that after August 30, 1956 "all of the assets of Babcock were held for the benefit of Book Production as sole creditor." It is stipulated that as of August 30, 1956 "the total assets of Babcock had a fair value of $935,625.00", and it is further stipulated that "[the] claims of Middle States which were assigned to Book Production were valued at $510,000.00" and that "[respondent] does not contest this valuation." Respondent on brief contends that this left the amount of $425,625 ($935,625 minus $510,000) applicable to the outstanding claims of Book Production against Babcock and that, as a result of the transactions of August 30, 1956, Book Production actually received the Babcock assets or, at the very least, exercised such a measure of control over the Babcock assets that the value of such assets was "properly accruable" by Book Production as of that date. We do not agree with respondent. The question is a factual one, as respondent recognizes on brief, and we do not believe that the respondent has met *336 his burden of showing that the events on or about August 30, 1956 resulted in a gain of $425,625 to Book Production. Babcock remained in corporate existence and respondent has not convinced us that such existence can be ignored. See Moline Properties, Inc. v. Commissioner, 319 U.S. 436. Babcock continued to hold its assets (the Robed note and the Bellanca stock) after August 30, 1956 and after that date Book Production was still, as before, a creditor of Babcock. The only difference was that now Book Production was the sole creditor, but we do not see how this by itself is tantamount to a realization or a disposition of its claims against Babcock so as to result in the realization of any gain or loss. Section 1001. Nor is there any justification, on this record, for finding that Book Production exercised such a degree of control over Babcock that we can somehow resort to the doctrine of constructive receipt which would throw into Book Production income for 1956 the value of a portion of Babcock's assets. See R. E. Hughes, Jr., 42 T.C. 1005, where this Court stated that "[it] is settled law that the doctrine of constructive receipt is to be applied sparingly. *337 " Finally, we do not believe that, as a result of the August 30, 1956 transactions, there accrued to Book Production, under any accrual method of accounting, the right to receive income measured by the value of the Babcock assets. Book Production did, of course, expect to realize something from its claims against Babcock, but this realization would have to wait until Babcock was in a position to make payment on its obligations. [13] This would turn largely on the collections it was able to make on the Robed note in the amount of $710,000. In this respect, we should point out that the value of such note in 1956 is open to some question. The record shows that The Robed Company defaulted on the due date (January 6, 1957) of the first installment of $71,000 and that the matter was then placed in the hands of attorneys, with ensuing litigation over a period of two years. The valuation of the note would, of course, have a direct bearing on the amount of any income which would, under respondent's argument, be includable in Book Production's income for 1956. *338 We sustain the petitioner, Book Production, on this issue. Decisions will be entered under Rule 50. Footnotes
1. All section references will be to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
*. The press was under lease by Book Production to Cuneo Eastern Press, Inc., a wholly-owned subsidiary of The Cuneo Press, Inc. The lease was assigned to Middle States. ↩
**. A 25-year leasehold consisting of a sublease on factory premises in Mundelein, Illinois.↩
*. To September 30, 1951.↩
*. Represented by a note with due date of 1/3/50. ↩
**. Represented by a note dated 2/4/48 due 8/6/49.↩
*. Includes $1,158,489.77 payable to Book Production. ↩
**. Includes advance payment from Cuneo Press, Inc. in the amount of $1,200,510.34.↩
2. The Cuneo Press, Inc. was incorporated under the laws of Illinois. As of the close of the taxable year ended January 31, 1956 the corporation had outstanding 14,000 shares of preferred stock and 1,059,748 shares of common stock. Book Production owned 651,203 shares of the aforesaid common stock. At all times here relevant the corporation's stores were listed on the New York Stock Exchange.↩
*. This does not take into account the release of interest accrual made by Book Production in the amount of $43,779.59 in the taxable year ended January 31, 1954.↩
3. Middle States actually deducted the amount of $135,356.09 as a Babcock bad debt in the taxable year ended January 31, 1957.↩
4. It is stipulated that the net operating loss of Mellody Mills, Inc. for 1956 was in the amount of $95,185.75.↩
5. The Lincoln and Peterson Avenues property and the Libertyville Shopping Center each consisted of one-story structures constructed by Middle States and each included five or six stores under lease. The North Clark Street property acquired by Middle States consisted of a one-story structure with two stores under lease.↩
6. In Rev. Rul. 61-156 (revoking Rev. Rul. 56-541, 1956-2 C.B. 189) 1961-2 C.B. 62, the respondent ruled that a transaction in which substantially all of the assets of the old corporation were transferred to a new corporation qualified as a reorganization under either subsection (E) or (F) of section 368(a)(1)↩, even though only 45 percent of its stock was owned by stockholders of the old corporation. Because of the apparent differences in the factual pattern of the ruling from that in the present case, it can have no application here.
7. Nearly all of the common stock of American Processing was held by Graphic Arts Industrial Services, Inc., while the preferred stock was held by Graphic Arts Industrial Services. Inc. and Book Production. Cuneo owned all of the capital stock of Graphic Arts Industrial Services, Inc. prior to 1956 and also owned 60 percent of the Book Production stock.↩
8. In a deficiency notice mailed August 25, 1959 to Book Production, the respondent, among numerous proposed adjustments in the consolidated net income of Book Production for the years 1953 through 1955, disallowed the Mellody Mills losses for those years. On November 16, 1959, Book Production filed a petition in this Court contesting said disallowance (Docket No. 84046). In another proceeding in this Court relating to numerous adjustments in the consolidated tax liabilities of Book Production for the years 1950 through 1952 (Docket No. 79192) respondent, in an amended answer filed on September 26, 1960, claimed an increased deficiency for 1952 through the disallowance of the net operating loss of Mellody Mills for the three months period ended December 31, 1952. The claimed deficiencies in the above proceedings and all issues raised therein, including the disallowance of the Mellody Mills losses, were compromised and settled by the parties before trial.↩
9. It would also appear that this arrangement of the parties conflicts with the real purpose of granting the privilege to file consolidated returns. In J.D. & A. B. Spreckles Co., 41 B.T.A. 370, this Court said: It is apparent that the privilege was granted in order that the tax liability of a group of corporations which were combined for business purposes into one business unit might be based upon the true net income of the business unit. The framers of the statute evidently believed and intended "that no ultimate advantage under the tax laws really results" from the granting of the privilege to make consolidated returns and that "[no] improper benefits are obtained from the privilege." It is believed that they did not intend that the privilege be enjoyed in cases where the affiliation relied upon as the basis for the privilege to make a consolidated return is without a business purpose.↩
10. Respondent, by letter dated June 29, 1959, disallowed this deduction in its entire amount, and on October 5, 1959, American Processing, pursuant to assessment, paid the resulting deficiency in income tax for its taxable year ended March 31, 1956. On September 18, 1961, American Processing filed with the district director of internal revenue at Chicago a claim for refund for the taxable year ended March 31, 1956, based on the allowance of the partially worthless debt of Mellody Mills in the amount of $405,227.95. Following respondent's disallowance of this claim, American Processing filed a suit for refund against the United States in the United States Court of Claims (Docket No. 364-62). Said proceeding is presently awaiting hearing in that Court.↩
11. Respondent disallowed these deductions and made numerous arguments in a deficiency notice mailed to Book Production on August 25, 1959, and Book Production filed a petition in this Court for the years 1953, 1954 and 1955 (Docket No. 84046). All of the issues in Docket No. 84046 were settled and, in connection with such settlement, Book Production conceded the propriety of respondent's disallowance of the aforesaid bad debt deduction.↩
12. Babcock also held 2,493 shares of Automatic Washer Co. stock having a nominal value.↩
13. It is stipulated that all of the taxable years of Book Production following 1956 are presently subject to audit and assessment by respondent.↩