**AMERICAN PROCESSING AND SALES COMPANY**

**v.**

**The UNITED STATES.**

**No. 364-62.**

United States Court of Claims.

Jan. 20, 1967.

John Enrietto, Washington, D. C., for plaintiff. Charles D. Hamel, Washington, D. C., attorney of record. Arthur Peter, Jr., and Hamel, Morgan, Park & Saunders, Washington, D. C., of counsel.

Robert Livingston, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant. Lyle M. Turner and Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner C. Murray Bernhardt, with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on December 7, 1965. Exceptions were filed by the defendant to the trial commissioner's recommended conclusion of law. Briefs were filed by the parties and the case has been argued orally. Since the court is in agreement with the opinion, findings and recommendation of the trial commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Plaintiff is, therefore, entitled to recover and judgment is entered for the plaintiff in the sum of two hundred fifty-one thousand, nine hundred twelve dollars and ninety cents ($251,912.90), with interest thereon according to law.

Commissioner Bernhardt's opinion,* as modified by the court is as follows:

The Commissioner of Internal Revenue disallowed the taxpayer's bad debt deduction of $405,227.95 for the fiscal year ended March 31, 1956. After deficiency assessment, the plaintiff[1] paid its increased tax liability and filed a claim for refund in the amount of $251,912.90 ($210,718.84, plus $41,194.06 interest). It sues here to recover that sum together with statutory interest. The controlling question is whether the plaintiff has sustained its burden of proving that the open account advances made by it to a related corporation were *bona fide* debts under section 166 of the Internal Revenue Code of 1954, or were in reality risk or equity capital and thus not eligible for deduction as bad debts. If found to be *bona fide* debts, a subsidiary question is presented as to the extent and date their worthlessness was proven.

At material times Mr. John F. Cuneo and his family, of Chicago, owned or controlled a series of large and profitable commercial enterprises, one of them being the American Processing and Sales

---

* The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

[1]. On May 31, 1963, plaintiff was merged into Book Production Industries, Inc., by virtue of a statutory merger under Illinois law. The surviving corporation is now known as Processing and Books, Inc.

Company, an Illinois corporaticn and the present taxpayer. American Processing operated a successful dairy, selling milk and milk products in the States of Illinois, Wisconsin, Indiana, Ohio and Michigan. It maintained a 2,700-acre farm in Libertyville, Illinois, under the name of Hawthorn-Mellody Farms Division (hereafter Farms Division), as distinct from the Hawthorn-Mellody Farm Dairy Division (hereafter Dairy Division), another of plaintiff's operating divisions.

The farm had a large herd of dairy cattle, breeding stock and horses, chickens, hogs, beef cattle, and turkeys. It raised grains (corn, alfalfa, wheat, oats, barley) primarily to feed the livestock. Most of the milk and egg production went to the Dairy Division. The Farms Division and the Dairy Division integrated their operations. The Farms Division, in turn, was subdivided into operating units, such as the Poultry Division, the Dairy Cattle Division, the Hog Division, etc. Prior to April 1, 1951, each of the operating divisions of the Farms Division ground and mixed feed for its own requirements, supplemented by outside feed purchases. On that date the Farms Division organized internally the Mellody Mills Division to centralize the preparation and supply of feed for the various other operating divisions of the farm in order to improve operating efficiency and effect economies.

The plaintiff constructed facilities on the farm to house the Mellody Mills Division. They consisted of a mill, warehouse, silos, and grain-unloading facilities. These facilities, including necessary mechanical equipment, were completed by September 30, 1952. Mellody Mills Division purchased, ground, and processed grain and other animal feeds for the Farms Division's own requirements, and marketed the balance. By September 30, 1952, it had made sales totaling $236,705.52 to the Farms Division and $31,945.58 to other purchasers,

but its even larger operating expenses had resulted in a net operating loss of $98,597.58 during the 18 months since its inception, not including, of course, the initial capital investment. Starting-up costs contributed heavily to the losses. Outside sales of surplus feed were contemplated. Eventual profit was intended, but plaintiff was prepared to weather initial losses until the enterprise turned the profit corner.

On September 25, 1952, a local of the International Association of Machinists filed a petition with the National Labor Relations Board for an order requiring an election of a union bargaining agent for the employees of the Mellody Mills Division. In order to confine this effort to the Mellody Mills Division and prevent danger of its spread to the rest of the Farms Division, or at least to allay dissension in the ranks of the other nonunionized Farms Division employees,[2] on October 16, 1952, Mellody Mills Division was incorporated as Mellody Mills, Inc., under Illinois law. Capital stock of 250 shares at $100 par value per share was authorized, of which 50 shares at $5,000 were issued and acquired by Book Production Industries, Inc. (hereafter Book Production). None was acquired by plaintiff.

Except for 55 shares of common stock in a trust for Mr. Cuneo's children, all of the common and preferred stock of plaintiff company was held by Book Production and by Graphic Arts Industrial Services, Inc., (hereafter Graphic Arts), an Illinois corporation. Mr. Cuneo owned or controlled both Book Production and Graphic Arts at relevant times, thereby owning and controlling through indirection their subsidiary, the plaintiff corporation. Although the bank trustee under the small trusts which were created was a member of the Book Production board of directors, and the directors discussed any differences of opinion which arose, it is safe to conclude that Mr. Cuneo, as principal owner-director, was the domi-

2. Farm laborers are generally exempt from coverage under the National Labor Relations Act, but processors who change farm produce into another product are not.

The Farms Division had 75 to 100 employees, while the Mellody Mills Division had about 8.

nant voice in decisions. The Book Production board of directors approved its purchase of Mellody Mills, Inc., stock in October 1952. The plaintiff's witnesses, including Mr. Cuneo, testified that income tax considerations did not enter into the incorporation or financing of Mellody Mills, Inc., and were not discussed in that connection. However, it may be conclusively presumed that businessmen of the acumen and experience of Mr. Cuneo, his associates and advisers, were at least aware of the potential tax consequences in incorporating Mellody Mills, Inc., even though the incorporation itself was immediately precipitated by the union trouble referred to above.[3]

The plaintiff had financed the construction and equipping of Mellody Mills Division, as stated, and effective September 30, 1952, transferred to Mellody Mills, Inc., net assets in the amount of $235,803.96, representing gross assets of $283,611.11 (buildings, inventory, equipment, accounts receivable), less liabilities of $47,807.15 (bank overdraft, trade accounts payable, cash advance by the Cuneo-owned Middle States Development & Equipment Company). The transfer of assets was treated as a sale by plaintiff to Mellody Mills, Inc., and was carried by the latter as a liability under an open account payable to plaintiff. No cash payment was made by the purchaser, or promissory note signed, or interest charged then or later. Under Illinois law the plaintiff, as vendor of real estate, held a vendor's lien on the buildings and fixtures as security for payment of the purchase price. Otherwise, plaintiff had no other security for its advances to Mellody Mills, Inc. The Illinois vendor's lien is an equitable lien giving the holder priority over any person except a *bona fide* purchaser for value without knowledge.

The $5,000 initial capitalization of Mellody Mills, Inc., through acquisition of 50 shares by Book Production [4] was inadequate by itself for the conduct of operations. It was contemplated that additional capital needed would be derived from advances by plaintiff and feed sales to the Farms Division and others. After the incorporation of Mellody Mills, Inc., it continued to operate in the same manner as had the former Mellody Mills Division of the taxpayer. A Mr. Heinson continued on as general supervisor of both the Farms Division and of the newfound Mellody Mills, Inc. (hereafter Mellody, unless its earlier form as Mellody Mills Division is specified). Heinson ran the day-to-day activities. Mr. Cuneo, who lived at the farm, was in charge of policy and major decisions.

Mellody prepared and sold about 25 varieties of animal feed to the Farms Division and to outside purchasers. It purchased ingredients from the Farms Division as well as from outside sources, and at comparable prices with certain justified adjustments. It sold feed to both the Farms Division and outside purchasers also at comparable prices, with an adjustment in favor of Farms Division for lack of expenses such as trucking and sales costs. In all but two years from 1952 to 1959 (when it liquidated) Mellody's sales to the Farms Division exceeded its outside sales. In 1954 Mellody obtained a five-year contract with General Mills, Inc., to furnish it a minimum of 600 tons of feed monthly, processed from ingredients supplied by General Mills. In the spring of 1953 Mellody entered the dogfood business to increase its sales volume, most of it being sold to distributors and chainstores, including the National Tea Company, a grocery chain also owned by Mr. Cuneo. Dogfood soon became Mellody's principal

---

3. Although the NLRB ordered an election, when it was held in April 1953 the union lost, and the employees of the Farms Division and Mellody Mills, Inc., were not thereafter organized.

4. This was actually paid for by a series of intercompany bookkeeping transactions.

The Mellody Mills, Inc., account payable to plaintiff was credited $5,000; whereupon, plaintiff credited its own note payable to Book Production in a similar amount.

business, and accounted for a large proportion of its total expense for advertising and salesmen's salaries.

Both before and after its incorporation, Mellody was constantly in need of operating capital, which was supplied by plaintiff through payment of bills for materials and services routinely forwarded by Mellody to plaintiff, except for payroll disbursements and some smaller bills which were met by Mellody. Bills paid by plaintiff for Mellody were charged to plaintiff's open account, against which were entered credits for Mellody's feedsales to the Farms Division. Mellody's open account balance due plaintiff from these mutual exchanges started with $230,803.96 on September 30, 1952, and increased each year thereafter until it reached $528,324.49 as of March 31, 1960. On March 31, 1956, it stood at $445,194.71. In that same period (to 1959) Mellody had been advanced another $106,384.96 by its official parent, Book Production, which at no time had guaranteed plaintiff's advances to Mellody. The plaintiff never demanded repayment by Mellody, nor did it file suit. There is no reason to think that Mellody did *not* intend repayment. It had no difficulty in obtaining credit from other sources, but these sources were always companies owned or controlled by Mr. Cuneo.

Mellody never had a profitable year from 1952 through its liquidation in 1959. The profit and loss summary in finding 21 shows the following annual losses and the cumulative total at the end of each calendar year:

|  | LOSS | DEFICIT 12/31 |
|---|---|---|
| 1952 (3 mos.) | $ 44,697.70 | $ 44,697.70 |
| 1953 | 87,705.65 | 132,403.35 |
| 1954 | 113,949.86 | 246.353.21 |
| 1955 | 300,353.21 | 546,698.44 |
| 1956 | 95,185.75 | 641,884.19 |
| 1957 | 10,709,97 | 652,394.16 |
| 1958 | 9,669.72 | 662,263.88 |
| 1959 | 10,821.68 | 673,085.56 |

The 1955 loss figure in the foregoing schedule includes an unrecovered loss of $167,583.62 after insurance proceeds, resulting from a disastrous fire in September 1955 which destroyed Mellody's mill, machinery and equipment, and three silos, leaving only five other damaged silos and a warehouse plus a small amount of equipment. Prohibitive rebuilding costs and general problems in the feed business persuaded Mellody not to rebuild the destroyed facilities. It was decided to abandon the general feed business and to concentrate on the dogfood business in order to realize on the heavy advertising investments to date in that product and the marketing success experienced. At that time the dogfood business was Mellody's sole but uncertain hope for the future. The hope did not materialize largely because prohibitively heavy advertising expenses would have been required. Purchasers of the business could not be found. On November 15, 1959, Mellody discontinued all business activity and transferred all of its operating assets to A. W. Heinson & Company (Heinson had been Mellody's manager) for a consideration of $47,130.87, of which $10,000 was paid in cash and the balance in deferred installments to be based on dogfood sales.

In the four-year period ending March 31, 1960, Mellody amassed a debit bal-

ance of $83,129.78 on plaintiff's books, as contrasted with assets of $47,130.87 transferred to plaintiff as of November 15, 1959. In the same four-year period the credits to Mellody's account on plaintiff's books ($86,018.60) would have exceeded the debits except for the expenditure of $62,022.34 for advertising and salesmen's salaries in promoting sales of dogfood.

Middle States Development and Equipment Company, an Illinois corporation in the real estate business, was owned by Mr. Cuneo and Book Production. Through 1955 Middle States loaned money to Mellody on an open account. For its fiscal year ending January 31, 1955, Middle States claimed on its income tax return part of its debt from Mellody as a partially worthless bad debt, and claimed the balance on its return for the fiscal year ending January 31, 1956. The Tax Court upheld the Commissioner's disallowance of these deductions in an opinion filed March 25, 1965 (24 T.C.M. 339). Middle States was liquidated in 1956 and no attempt was then made to collect the $55,389.49 it had advanced to Mellody. On its books, Mellody transferred that amount to capital surplus from an account payable to Middle States.

The consolidated income tax returns filed by Book Production for the years 1952 through 1959 treated Mellody as an affiliated corporation and included its losses of $673,085.56 in computing consolidated net income. After disallowance of the loss claimed for 1953 through 1955, and an appeal to the Tax Court which involved additional matters, the parties compromised with the written stipulation that the settlement would not be a precedent for other tax years of Book Production, and would not be referred to by the instant plaintiff "in connection with any claim for a tax benefit in respect of an alleged account payable or accounts payable to American Processing and Sales Company from Mellody Mills, Inc.", or prejudice plaintiff.

On March 25, 1965 (Book Production Industries, Inc. v. Comm'r, 24 T.C.M. 339), the Tax Court sustained the Com-missioner's disallowance of Book Production's claim for deduction of Mellody's operating losses for the year 1956 in computing Book Production's consolidated net income for that year. Book Production has not claimed and has not been allowed any deduction for income tax purposes, in any taxable year, on account of its investment in the capital stock of Mellody, nor on account of its advances to Mellody aggregating $106,372.46 as of December 31, 1956. Book Production's tax years 1957 through 1959 are still subject to audit and assessment by the Internal Revenue Service.

In its income tax return for the fiscal year ended March 31, 1956, plaintiff claimed a bad debt deduction of $405,-227.95 for partial worthlessness of the Mellody account payable. Its disallowance resulted in a deficiency assessment of $220,840.72, which was paid on October 5, 1959, together with $43,172.85 in interest. A claim for refund was filed on September 18, 1961, in the amount of $210,718.84, plus interest of $41,194.06. As an alternative to its bad debt claim, plaintiff claimed the $405,227.95 as a loss resulting from the September 1955 fire in which most of Mellody's assets were destroyed.

The governing bad debt provision of the IRC has undergone considerable refinement since its original promulgation as section II(B) of the Revenue Act of 1913. Its initial limitation to wholly worthless debts was lifted by the 1921 Act which embraced for the first time partially worthless bad debts. 1921 Act, secs. 214(a) (7), 234(a) (5), and 247 (a) (5). In subsequent years the language was further amended to eliminate technical requirements of ascertainment of worthlessness and formal chargeoff of debts which were worthless in whole or in part (see relevant provisions of the 1932 and 1942 Acts), and to permit the relation back of a partially worthless debt to periods prior to the deduction, as well as the deferment of such bad debt claims to subsequent years. The metamorphosis of the "partially worthless" section germane to our present claim is expressed

as follows in sec. 166(a) (2) of the 1954 Act:

When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.

A cardinal difficulty in the administration of the bad-debt provision has been the distinction between debt and equity for purposes of the deduction. Regulation 1.166–1(c) provides as follows:

* * * A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. * * *

According to Mertens:

*The important underlying principle is that no valid debt exists unless there is an unconditional obligation of another to pay the taxpayer.* It is the sine qua non of the existence of the debt and accordingly of the right to deduct worthless debts. * * * To constitute a valid debt, there must not only be a legal obligation to repay, but the money must have been advanced with reasonable belief at the time that it would be repaid. 5 Mertens, sec. 30.03, 1963 rev.

There is no dearth of cases in this province of tax law. So large is their number and disparate their facts, that for every parallel found, a qualification hides in the thicket. At most they offer tentative clues to what is debt and what is equity for tax purposes; but in the final analysis each case must rest and be decided upon its own unique factual flavor, dissimilar from all others, for the intention to create a debt is a compound of many diverse external elements pointing in the end to what is essentially a subjective conclusion. Elsewhere these elements have included such criteria as the "real intention" or "true intention" of the parties as expressed in the instrument of debt and corroborated by surrounding facts; ratio of debt to equity in the financial structure of the debtor (i. e., the "thin incorporation" line of decisions which enjoyed a decade of popularity); reasonable expectation of repayment regardless of the success of the venture; substantial economic reality of the transaction; and maintenance of proportional holdings by stockholders whose purported loans remain in suspicious balance with their capital contributions.

The resolution of this particular case hinges in the first instance on whether the incorporation of Mellody served a business purpose or was motivated principally by tax avoidance, the latter being a bar only if the purpose is for "securing the benefit of a deduction * * * which such person or corporation would not otherwise enjoy, * * *." Sec. 129(a), I.R.C.1939. Although the defendant did not define it as an issue in the pretrial stages, nor contend for it in a positive way at trial, in its brief it now asserts that Book Production's purchase of Mellody's capital stock, and the plaintiff's open account advances to Mellody, were all part of a scheme for Book Production and the plaintiff to obtain a double deduction by claiming Mellody's operating losses twice. This will bear some inquiry, for in Book Production Industries, Inc., v. Commissioner, decided March 25, 1965 (24 T.C.M. 339), the Tax Court considered the labor problems which the plaintiff alleges led to the incorporation of Mellody, and reached certain conclusions at page 354:

None of this helps * * *.

The real reason for this particular arrangement devised by the parties is suggested by the tax benefits that would flow from it. American Processing continued to make heavy advances to Mellody Mills during the years 1952–1956 when it was a subsidiary of Book Production, and, as we have seen, Mellody Mills had substantial operating losses during the period. If Mellody Mills were operated as a division of American Processing, these losses would, of course, reduce the taxable income of American Processing, and, of course, there would be no additional deduction for the advances to the

division. This would also be true if Mellody Mills were operated as a subsidiary of American Processing. This is so because the regulations under the consolidated returns section of both the 1939 and 1954 Codes provide that no bad debt deduction for advances by a parent to subsidiaries are allowed during the period of consolidation, and even after the period of consolidation the bad debt loss would, generally, have to be reduced by the losses of the subsidiary availed of during the consolidated period. Regs. 129, sec. 24.40; sec. 1.1502-40, Income Tax Regs. However, the provisions of these regulations could be avoided by the device used here, since the losses of Mellody Mills could be availed of on the consolidated return filed by its parent, Book Production, and at the same time the advances made by American Processing could be deducted in full when worthless or partially worthless without any reduction for the operating losses incurred by Mellody Mills.

Consolidated returns are authorized by §§ 1501–1504, I.R.C.1954, for which the Treasury has promulgated intricate regulations. Reg. §§ 1.1501–1.1504. Under the statute and regulations an affiliated group of corporations may elect to file a consolidated return in lieu of separate returns, so that the group may be taxed upon its consolidated taxable income instead of upon the individual incomes of each separate corporation in the group, subject to certain limitations as to what constitutes affiliation, and "protective measures against the acquisition of a loss corporation in order to apply its net operating losses against the income of more prosperous members of the group." Bittker, Federal Income Taxation of Corporations and Shareholders, 1965 ed., p. 72. If Book Production were to have been permitted to file a consolidated tax return and treat Mellody as an affiliated corporation, then the defendant says Book Production could have deducted Mellody's operating losses, while at the same time American Processing would endeavor to deduct them as bad debts

in the guise of unreimbursed open accounts, thus contriving a double deduction for the same losses. The Tax Court in the *Book Production* case, *supra,* considered this duplication to be Mr. Cuneo's controlling purpose in setting up Mellody in the way it was. The plaintiff contends that the Tax Court failed to give due consideration to the limitations built into the consolidated return regulations with respect to the adjustment of losses in such returns. The Tax Court, says the plaintiff, recognized that losses taken on a consolidated return must, under the applicable regulations, reduce the investment basis of stock or advances to a subsidiary, but failed to recognize that any *excess of losses* over such stock basis or debt must also eventually be accounted for, which consideration was the principal matter taken into account in the settlement of Book Production's tax liabilities involving the disallowance of Mellody's losses for the taxable years 1952 through 1955.

The *Book Production* decision of the Tax Court referred to above involved the calendar year 1956, but in 1960 Book Production settled a claim before the Tax Court for tax deficiencies for the years 1950 through 1955, with a settlement agreement providing that the settlement of the loss claims involved there would not prejudice the claims of Book Production or American Processing for bad-debt deductions in subsequent years arising from advances to Mellody. In raising the same argument here that was present in the settlement agreement, the plaintiff considers that the defendant has reneged on its agreement. As to this the plaintiff is overstating the settlement agreement, for by agreeing that the settlement would not prejudice the plaintiff in a similar claim for subsequent years the Government did not promise not to raise the same issue for adjudication here. It is estopped neither legally nor ethically to do so.

However, the other points made by plaintiff are valid. Proper exercise of the loss limitation features in the consolidated return regulations should curb a

double deduction. In administering consolidated returns the Commissioner is not confined to an adjustment to basis in the manner mentioned above for, by virtue of section 45 of the 1939 Code (the predecessor of section 482 of the 1954 Code relating to allocation of income and deductions among taxpayers), he had broad powers to allocate income and deductions among Book Production and affiliated corporations if he considered that necessary in order to forestall tax-avoidance by related corporations. Section 45 would be available to the Commissioner to prevent the double deduction of which the defendant makes such capital.

If the incorporation of Mellody was not part and parcel of a device for Book Production and plaintiff to obtain a double deduction, it becomes more plausible to accept the plaintiff's explanation at face value that the purpose was to avoid the risk of unionization of the Farms Division. In order to minimize the risk, separation of Mellody's ownership was essential; hence the arrangement for Book Production to acquire the capital stock as parent, rather than the plaintiff, for if Mellody were to become an incorporated subsidiary of plaintiff, the plaintiff reasonably thought that, under the applicable legal precedents, the Farms Division would have remained still vulnerable to the unionizing effort. In its decision in the *Book Production* case, supra, the Tax Court was not impressed with this union activity as the primary business purpose of Mellody's incorporation, either because the evidence was not too clear, or because despite the incorporation of Mellody, the National Labor Relations Board ordered an election which the union lost, so that it was the disinterest of the employees rather than the incorporation of Mellody which produced the desired result for the plaintiff. There is ground for respectful disagreement with the Tax Court's conclusion, which perhaps proceeded on a less adequate record than ours in that area. As the Tax Court elsewhere found, in Pre-Mixed Concrete, Inc., (1962) P–H

T.C. Memo. Para. 62,301, quoting from another case with approval:

It well may be and in fact it is demonstrated that some of the stated reasons of Superior in incorporating petitioner were not well founded, but this does not nullify the existence of the reasons. * * *.

Similarly, the mere fact that the incorporation of Mellody was not ultimately responsible for producing the desired result of defeating the union's efforts does not diminish the fact that defeat of the union's efforts was nevertheless the motivating purpose for the incorporation. That purpose was essentially a *business* purpose, for the plaintiff naturally considered that continuation of the exemption of the Farms Division's agricultural labor from the NLRA would be vital to its economic future.

From the standpoint of timing, the incorporation of Mellody coincided with the labor union's efforts, and to attribute its purpose to tax avoidance is to overlook certain realities of the situation. Mellody was formed to make profits, not to incur losses. Only the incurring of losses by Mellody would have fueled the double-deduction argument upon which the defendant relies. Had Mellody continued its operations as an unincorporated division of the plaintiff company, its losses would have been offset against plaintiff's ample income. But the defendant contends that by incorporating Mellody with the purpose of achieving a double deduction, the plaintiff estopped both itself and Book Production from deducting Mellody's admittedly heavy economic losses, an incongruous result which the defendant justifies by asserting that the difficulty was of plaintiff's own making, citing Sterno Sales Corp. v. United States, 345 F.2d 552, 170 Ct.Cl. 506 (1965), holding that " * * * a taxpayer must normally accept the tax consequences of the way in which he deliberately chooses to cast his transactions * * *." If we accept the conclusion that frustration of the unionization drive was the plaintiff's prime goal in incorporating Mellody, and in further-

ance of that end Mellody was financed in a manner of plaintiff's devising, when the Commissioner later smelled a different purpose and construed plaintiff's open account advances to Mellody to be capital contributions rather than the loans they were intended by the parties to be, then it is the Commissioner who deliberately chose to cast the plaintiff's transactions in a mold different from the taxpayer's intention. In short, I do not believe the facts warrant a finding in this instance that a tax tail wagged a labor dog.

As a final word on the purpose of incorporating Mellody, it seems rather farfetched to attribute it to a stratagem of such dubious attainment as to achieve a double deduction which itself would rest on a deliberate intent for Mellody to be a loss corporation, an intent which is refuted by Mellody's pronounced efforts to develop and enlarge its business through relatively heavy investments in advertising and sales activities. The record lends convincing support to the conclusion that Mellody's prospect for eventual viability was reasonably good until the fire brought things to a halt in late 1955.

Having found as a threshold proposition that the plaintiff's purpose in incorporating Mellody was to defeat a unionizing effort rather than to perpetrate a tax hoax, it must now be determined whether Mellody did in fact create a debt in accepting advances from the plaintiff. This is more familiar territory. Birdsboro Steel Foundry & Machine Co. v. United States, 3 F.Supp. 640, 78 Ct. Cl. 100, 108 (1933), dealing with the section 234(a) (4) bad debt provision of the 1918 Revenue Act, affords a still valid definition of the debtor-creditor relationship in, however, an otherwise nonrelevant context:

* * * The relationship of debtor and creditor arises where one person, by contract or law, is liable or bound to pay another an amount of money, certain or uncertain, and it is not necessary that the debt shall be due in the sense that it is then collectible;

it must be an outstanding obligation, which, if not due at the time, will certainly become due at some future date.

■ A presumptive correctness attends the decision of the Commissioner as to deductibility, and the taxpayer has the burden of proving otherwise. United States v. Rindskopf, 105 U.S. 418, 26 L. Ed. 1131. Three cases from a large crop have been emphasized by the parties in their briefs as representing most of the contentions urged for application here. They are: George E. Warren Corp. v. United States, 141 F.Supp. 935, 135 Ct. Cl. 305 (1956); Gilbert v. Commissioner of Internal Revenue, 248 F.2d 399 (2 Cir. 1957) and 262 F.2d 512 (1959); and Byerlite Corp. v. Williams, 286 F.2d 285 (6 Cir., 1960).

The plaintiff leans heavily on George E. Warren Corp. v. United States, supra. Warren bought and sold coal as agent for small producers, advancing funds to them against future deliveries. Warren's stockholder officers formed Margarette Coal Corporation in 1930 to mine coal from leased properties, with Warren acting as exclusive agent and transiter on the same basis as for other producers. Both Warren and Margarette were owned and officered by the same two individuals. Advances by Warren and credits against them were carried as an open account on Margarette's books, with no notes, security, or interest involved. Margarette operated profitably until 1942, when it owed a balance of $29,000 to Warren on the open account as of January 1, 1942. The balance increased to $601,339.18 by the end of 1944, due to losses in the intervening years occasioned by unsuccessful strip mining operations which Warren had relied on at the outset as the means for Margarette to repay Warren's continuing advances. Margarette abandoned its depleted principal lease in 1944 and at the end of the year Warren wrote down the open account from $601,339.18 to $136,477.25, the then value of Margarette's assets over its liabilities, exclusive of Warren's open account. Margarette continued in business on a reduced scale on another

leased property, and believed that its future production would enable it to repay future advances by Warren in addition to the $136,477.25 then owed. When Margarette went out of business in 1953 the credits to the open account with Warren exceeded Warren's additional advances by $17,000. In rejecting the defendant's contention that the partial bad debt deduction in 1944 was improperly taken because a true debtor-creditor relationship did not exist between the two corporations, the Court of Claims held that the advances had been made "with a reasonable expectation of repayment and represented a true indebtedness." The common ownership of the debtor and creditor corporations was held to require close scrutiny of the transaction, but the record showed it could have been made between parties dealing at arm's length because plaintiff dealt with Margarette "in exactly the same manner that it did with other coal producers, except for the greater net advances made to Margarette.", which were found to have had a reasonable justification.

Very likely the present taxpayer, in advancing large credits to Mellody, had just as much reason to expect that Mellody's operating profits would permit repayment as did Warren in its advances to Margarette in the *Warren* case cited above. While Margarette's past operations had been profitable in contrast with Mellody's record of consistent losses at all times even before its incorporation, this is countered by the fact that Mellody had a spanking new and modern plant compared to Margarette's depleting coal mine lease and was developing outside customers through extensive promotional work. On the other hand, Warren established that it dealt with and advanced money to unrelated coal producers on the same basis as it dealt with Margarette, and in contrast it is not evident that our plaintiff advanced money to unrelated corporations under the conditions and terms given to Mellody, and equally difficult to believe that Mellody could have secured such credit tolerance from an unrelated, arm's-length lender. This is a

factor which courts in the past have considered. Matthiessen v. Commissioner of Internal Revenue, 16 T.C. 781, aff'd, 194 F.2d 659 (1952); J. A. Maurer, Inc., v. Commissioner, 30 T.C. 1273. But non-availability of commercial bank loans without security is not an unfailing bar. Ewing Hymers, P–H 1944 T.C. Memo. Para. 44,407. On the plus side, plaintiff and Mellody were mutual markets for each other's products as reflected in the continuous charges and credits for raw materials in one direction and finished feed sales in the other, whereas Warren furnished Margarette cash only. On the comparative merits between the two cases one could conclude that plaintiff had approximately as much prospect of expecting repayment of its advances to Mellody as did Warren of its loans to Margarette, so to that extent a debtor-creditor relationship was intended in each instance, although there was more reason to doubt an arm's-length dealing in the case at bar then in the *Warren* case. In both cases no notes, security or interest were involved in the advances, but their absence is not fatal to characterization of the advances as debts, since an open account is fully as enforceable as a note. In Mellody's case almost half of its advances enjoyed the security of a vendor's lien on the initial equipment transfer under state law, which gave Mellody a form of security which was not present in the *Warren* case.

The benefits which the *Warren* case may confer on the plaintiff's contentions must be viewed in the light of this court's most recent pronouncement on the subject in Affiliated Research Inc. v. United States, 351 F.2d 646, 173 Ct.Cl. 338 (1965). Of the tests which the court there applied leading to its decision that certain advances on which interest payments were made were in fact capital contributions and the payments were actually dividends, those relevant to the present inquiry are (1) whether repayment of advances depended upon the success of the debtor, (2) whether an outsider would have made advances on the same conditions, and (3) the heavy pre-

8ponderance of debt to equity in the financial structure of the borrower. It is readily apparent that repayment of the present plaintiff's unsecured advances to Mellody depended entirely upon the latter's financial success. It has already been observed that the record does not establish that Mellody would have been able to borrow from an unrelated lender on the same generous terms it obtained from plaintiff. As to the third criteria mentioned, in the *Affiliated Research* case the debt-equity ratio of 131-to-1 was felt to be "an extremely high one", although "not in itself decisive". The comparable ratio in the case at bar depends upon what figures are used. If we were to add to Book Production's initial $5,000 purchase of Mellody's stock its subsequent cash advances totaling $106,372.46 through 1956, and consider all of these to be capital contributions, then in the years 1953 through 1956 the ratio of plaintiff's advances to Book Production's capital investment; in Mellody would average a fraction more than 4-to-1, a respectable balance. Conversely, if Book Production's cash advances of $106,372 were to be deemed debts, then the ratio of Book Production's debt plus plaintiff's debt to Mellody's $5,000 capital structure would have been 120-to-1 by the end of 1956. Or the ratio changes radically if we eliminate from the category of capital contributions the $230,-803.96 represented by the sale of assets by plaintiff to Mellody, even if the balance of the open account were to be treated as equity. The task of determining this elusive ratio becomes more complicated if we include other creditors in the equation, such as the Cuneo-controlled Middle States Development and Equipment Company, which also made sizable cash advances to Mellody. In addition to the manifest difficulty of ascertaining the appropriate ratio in the present instance, it is also true that courts are loathe to rewrite corporation balance sheets to reflect a Government version of glowing corporate health. Charles E. Curry, 43 T.C. 667, 691; Scotland Mills, Inc. (March 5, 1965) P–H 1965 T.C.

Memo. 1965–48. For other cases where "thin capitalization" did not prevent recognition of advances as debts, see Kinsel v. United States (Dist.Ore., 1959), 5 AFTR 2d 480, 482; Ray A. Myers (1964) 42 T.C. 195; J. I. Morgan, Inc. (1958) 30 T.C. 881; Leach Corporation (1958) 30 T.C. 563.

It should be also noted that in the *Affiliated Research* case the court placed weight against the plaintiff on a factor not involved in the present case, namely, that the moneys advanced to plaintiff by three brothers were in amounts proportional to their capital stock ownership, a circumstance which tended to establish the advances in actuality as camouflaged capital contributions, as in Gilbert v. Commissioner of Internal Revenue, supra.

Gilbert v. Commissioner of Internal Revenue was decided twice by the Second Circuit, the second time after receiving from the Tax Court more explicit findings pursuant to an earlier remand for that purpose. In its first decision the court discussed at some length the standards which it felt applied in distinguishing a loan from a capital investment in tax matters. It echoed indirectly the tests of debt present in the *Warren* and *Affiliated Research* cases of this court, supra, by ruling that debts require "reasonable expectations of repayment regardless of the success of the venture or [whether advances] were placed at the risk of the business", and considering further whether the transaction "accords with substantial economic reality.", tax avoidance motives being held "relevant only insofar as they contribute to an understanding of the external facts of the situation." On remand the Tax Court had made additional findings drawn from the trial record. The relevant findings were that (1) the debtor corporation was not sufficiently capitalized to conduct its business, (2) no outside investor would have made similar advances to the debtor without security or normal creditor safeguards, (3) there was no effort by the lender taxpayer to enforce the obligation, and (4) repayment depended entirely

upon the success of the debtor's business and the loans were therefore placed at the risk of the business as a matter of "substantial economic reality". An additional finding not relevant to the present case but instrumental there, was that the advances made by taxpayer and other stockholders to the debtor were in substantial proportion to their respective stockholdings, and thus more indicative of an intent to share an investment risk rather than to loan money. On the basis of the additional facts furnished by the Tax Court, the Second Circuit sustained the Commissioner's disallowance of the deduction, ruling that "The form of the transaction is not controlling, but rather the substance.", and that "Where the loss sought to be regarded as a bad debt 'is as a matter of substantial economic reality a loss of risk capital' (248 F.2d 399, 407), it will be disallowed."

There are similarities in principle between the *Gilbert* case and the present one. Thus, Mellody's initial capitalization of $5,000 was inadequate for the conduct of its business and, depending on the mathematics selected, disproportionate to the advances made to it by the plaintiff. As to this the plaintiff responds that Mellody did not need heavy capitalization because it had a new plant purchased on open account from the plaintiff and secured by a state vendor's lien, and plaintiff was a captive market for Mellody's feed sales. As in the *Gilbert* case, there is no proof and no reasonable likelihood that Mellody would have been able to borrow from outside sources on the same liberal terms it obtained from plaintiff. Again, there is no indication that the plaintiff ever endeavored to enforce payment of Mellody's open account. Conceding that the institution of suit is not prerequisite to such a showing (see Reg. 1.166–2(b)), it is nevertheless unlikely that plaintiff would have been so forbearing with an unrelated debtor, if indeed it would have been so generous to make comparable advances in the first place. Finally, it is also beyond dispute that repayment of the advances in question by Mellody depended upon the success of its business operations. As a matter of "substantial economic reality" it is not likely that an unrelated lender would have behaved in plaintiff's fashion and loaned Mellody such large sums without security or interest, with repayment dependent on the borrower's eventual profit performance, no matter how optimistic it might appear to be. The prospect is impaired in this case by Mellody's past record of losses. The plaintiff asserts a basic difference between its circumstances and those in the *Gilbert* and other cases cited by the defendant, in that the open account between plaintiff and Mellody was the product of credits and debits resulting from mutually advantageous trading, rather than cash advances as in other cases. If one trims the $450,253 total debit balance by the $230,803.96 represented by the sale of plant assets to Mellody, the remaining $219,449.32 debit balance from trading activities assumes a different complexion than had it been solely cash advances, for the latter would be more amenable to construction as capital contributions. The plaintiff also maintains that its prospects for repayment of advances to Mellody were better than in the *Gilbert* and other cases and were frustrated by the disastrous and unpredictable fire in the fall of 1955, but for which Mellody would have developed a prosperous business enabling it to pay off its obligations. This is, of course, speculative in nature, but a reasonably good forecast of what might have been.

Byerlite Corp. v. Williams, supra, provides powerful support for the plaintiff's contentions. There, advances were made by a parent to a subsidiary corporation which the Government claimed to be contributions to capital of the subsidiary rather than "indebtedness." To avoid risking all of its corporate assets "from doing business under a colonial government", Byerlite organized an export subsidiary (known as Export) to remove and transport asphaltic materials from Aruba, Netherlands West Indies. Byerlite paid $30 for the only six shares of stock the subsidiary ever issued, and from

1947 to 1950 advanced $564,661.72 to Export for its operations in removing what amounted to a few thousand tons of asphaltic materials from Aruba. The advances were to be repaid from export fees to be allowed to Export at the rate of $1.50 per ton, which would have been just about enough for Export to defray its total costs of operation if the entire deposit of asphaltic materials had been removed as contemplated. The venture was a failure and Export was liquidated in 1950, turning over its remaining assets to Byerlite, which claimed a bad debt deduction for the uncollected portion of its advances, or $442,966.62. The District Court upheld the Commissioner's claim that the advances were contributions to capital but the Court of Appeals reversed and sustained the deduction of the uncollected advances as a bad debt.

The similarities between *Byerlite* and the case under consideration are striking:

1. Byerlite's purpose in organizing Export was to avoid risking all of its own assets in the uncertain post-war political climate of a colonial possession. Plaintiff's purpose was to avoid the economic consequences of union activity. Both purposes were business-oriented instead of being dictated by tax considerations.

2. Byerlite's debt v. equity ratio to its subsidiary was astronomically greater than the plaintiff's, but no mention of this as a factor was made by the court.

3. In each case the books of both borrower and lender used debt terminology, i. e., accounts receivable and accounts payable, in recording their transactions. "The decisive factor"—says *Byerlite* at page 290 of 286 F.2d—"is not what the payments are called but what, in fact, they are, and that depends upon the real intention of the parties."

4. In neither case was there any evidence of the indebtedness in the form of other than book accounts, nor fixed dates for repayment, nor charging of interest.

5. In each case the borrower's assets were insufficient to repay the advances.

6. In each case credits against the advances were made in the form of delivered materials, but in Mellody's case the trading was two-way between borrower and lender, while in Bycrlite the advances were in cash and the credits were in material. In each case the credits indicated that the advances were treated as loans by the borrower, rather than investments.

7. Export's need to sell capital stock was no more apparent than Mellody's. Byerlite supplied operating capital to Export. Mellody's position in this respect was more favorable than Export's, for in addition to having plaintiff as a source of operating capital and as a customer, Mellody was a fully equipped operating entity, and solicited and acquired outside customers.

8. In each case both stockholders and creditors took risks contingent upon the success of the business. Prospects of repayment were at least as good in Mellody's case as in Export's.

9. In each case the taxpayer's "risk of its money would have been the same if it had carried on the operation itself, as it was when carried on through the operation of its subsidiary." *Byerlite,* page 293.

In some respects *Byerlite* is a weaker case for establishing an "indebtedness" than the case under consideration, since it involved a wholly owned subsidiary, while Mellody was a subsidiary of Book Production and not of the plaintiff. Moreover, all of Export's products were to be channeled exclusively to Byerlite, while Mellody had the advantage of plaintiff as a reliable customer and at the same time actively cultivated outside sales.

■ The cases discussed thus far fail to provide unanimous guidance to a solution of the claim under consideration, but on balance they would justify a conclusion that the Commissioner was in error in holding plaintiff's advances to Mellody to be capital contributions rather than debts. There are several significant factors. The first is that the purpose of

Mellody's incorporation was to solve a labor problem and not to obtain a double deduction of operating losses in the manner previously described. Accepting this as correct, and further accepting the more obvious fact that Mellody was not in business to lose money, then for reasons which have been largely given the debit dealings between plaintiff and Mellody assume an unexceptionable pattern between closely affiliated companies. The logical consequence of the Government's contention would be to impress on Mellody an all-capital rather than a mostly debt structure, a more absurd result than reason permits be entertained. Another consequence would be to shrink to almost nothing the circumstances under which companies in the relative positions of the two in question could safely occupy a debtor-creditor relationship without danger of accusation by the taxing authorities that surface indicia of debt are contrived decoys to mask another aim.

These conclusions may be further fortified. The cases uniformly hold that for a transfer of funds to be a debt rather than an investment there must be a reasonable expectation of repayment that does not depend solely on the success of the borrower's venture. The unbroken losses of Mellody, both in its precorporate form and thereafter, are pointed to by defendant as proof that plaintiff could at no time have had a reasonable expectation that its advances would be repaid and that, *ergo*, they were necessarily investments in the future of the undertaking and rested on its ultimate success. It is true that Mellody was a losing proposition from the start, but fledgling enterprises often experience losses in their formative periods when they are incurring expenses for programs designed to expand into eventually profitable operations. This is exampled in Mellody's case. Although it had the benefit of a captive buyer in the plaintiff, Mellody worked to expand its markets for feed sales, and a year after incorporating launched an ambitious dogfood program involving heavy advertising and sales expenditures. In August 1954 it obtained a lucrative five-year contract with General Mills, Inc., for the processing of animal feed, hardly a sign that it was merely a tax sham and with no commercial purpose for remaining a business entity. Sales volumes for the period from September 1952 through the end of 1955 showed dramatic increases, a reflection of the expansion efforts and a demonstration that plaintiff placed justified confidence in Mellody's future ability to repay the heavy advances for operating costs. The credits to the open account arising from feed sales by Mellody to plaintiff manifest a continuing recognition by the parties that the advances were intended to be repaid as the business grew, a growth that was confidently expected until the disastrous fire in September 1955 destroyed Mellody's productive facilities and caused losses which dimmed its prospects. Cases abound where "indebtedness" was found despite the weak financial condition and operating losses of the debtor corporations. For example: Byerlite Corp. v. Williams, supra; Rowan v. United States, 219 F.2d 51 (C.A. 5, 1955); Van Clief v. Helvering, 77 U.S. App.D.C. 337, 135 F.2d 254 (1943); Valentine E. Macy, Jr., 1949 P–H T.C. Memo. Para. 49,009; Richard M. Drachman (1954) 23 T.C. 558, 562 Acq. 1955–1 C.B. 4 ("For the advances to be a loan, it is not necessary that there be an unqualified expectation of payment."); Allied Stores Corp. (1960) P–H T.C. Memo. Para. 60,209. Where the borrower is insolvent it is more credible that the lender would loan rather than invest, for a creditor enjoys a certain priority to a stockholder in the event of liquidation. Cf. S. E. Maitland Brenhouse (1961) 37 T.C. 326. In the final analysis all loans to a company depend for their repayment on the success of the borrower, and this is, of course, equally true of salvaging equity investments. Where the borrower says the equivalent of "We will not pay or even owe these advances if our business does not succeed.", without question the advances would be more in the nature of capital contributions, and if the ultimate failure of the borrower precludes repay-

ment, then no obligation is incurred. But this is quite different from the borrower stating "We have reasonable grounds to believe that we shall be successful, and we shall use your advances to that end, repaying you as expected earnings permit." Cf. Ortmayer v. Commissioner of Internal Revenue, 265 F.2d 848 (7 Cir., 1959). In each case the money is placed at the risk of the business, but no fixed, repayable obligation springs from the one as from the other. The real differences lie in the debt-creating intention of the parties, and the genuineness of repayment prospects in the light of economic realities.

Again, the open account form of the dealings between plaintiff and Mellody, as contrasted with standard secured interest-bearing notes which many an arms-length lender will exact from an unrelated borrower, is of little influence in identifying the transaction irrevocably as a capital contribution rather than a loan. Formal debt paraphernalia of this type in a closeknit family of corporate cousins are not as necessary to insure repayment as may be the case between unrelated entities, nor do they alone dictate a bona fide intention to create a debt without the accompaniment of other factors. Noninterest bearing open accounts resulting from mutual trading are a commercial commonplace, and none can say that an enforceable obligation to repay does not arise fully as much as from a promissory note. Security further insures repayment, but its presence or absence does not alter the central character of the transaction as a debt or something else. Formal indicia of indebtedness are merely clues to, but not indisputable proof of, the ultimate fact. In Lucia Chase Ewing (1946) P–H T.C. Memo. Para. 46,235, the Tax Court found that advances by the sole stockholder to her ballet promotion corporation were de-

ductible bad debts even though not evidenced by notes, or specifying repayment dates, or bearing interest, there being a bona fide expectation of repayment found based upon confidence (misplaced) in the ultimate success of the company.

The final issue to be resolved is whether the outstanding balance in the Mellody open account as of March 31, 1956 became partially worthless then (to the extent of the 90 percent charged off as worthless by plaintiff), or not until 1959 when the remaining assets of the business were sold for $47,130.87. Section 166(a) (2) of the Code provides as follows:

When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt   *   *   * as a deduction.

In making such a determination the District Director must consider all pertinent evidence. (Treasury Regulations, Section 1.166–2(a).)

One of the issues before the Tax Court in the *Book Production* case cited earlier concerned a similar claim as to the worthlessness of advances to Mellody Mills, Inc., after the 1955 fire by Middle States, another Cuneo-owned corporation. The Tax Court held (24 T.C.M. 339, 357) that the worthlessness of Mellody's obligation to Middle States in the taxable years ended January 31, 1955 and 1956 had not been established.[5] The defendant contends that if Mellody's obligation to Middle States was not considered worthless at the given dates, then *a fortiori* this plaintiff's advances, a good part of which were secured by the Illinois State vendor's lien, could not be considered partially worthless as of March 31, 1956. The Tax Court advanced as reasons for its adverse ruling the following:

*   *   * But the record shows that after September 1955 [date of the fire] Mellody Mills engaged in the business

---

5. It is not officially in the present record, but the plaintiff states in its brief that the Tax Court failed to mention a crucial fact that was included in a stipulation which is part of the Tax Court record, namely, that the Government agreed that as of October 31, 1956, the claim of Middle States against Mellody should be assigned no value at all. Assuming this to be without qualification, a question is raised as to the reasons for finding this debt not to be worthless nine months earlier in 1956.

of warehousing feed for General Mills and also for the farm division of American Processing and, in addition, went into the dog food business. * * *

Our record shows that Mellody had been in the dogfood business (with substantial losses) for over three years by March 31, 1956, contrary to the Tax Court's apparent understanding. Furthermore, while Mellody continued after the fire to warehouse feed for General Mills, it may be surmised that this was only of nominal benefit compared to the much larger loss of its previous business of grinding, mixing and selling animal feed. The influence of this factual misconception on the opinion of the Tax Court is not known.

The single most significant fact in support of plaintiff's contention that its advances to Mellody were 90 percent worthless at the time they were charged off to that extent on March 31, 1956, is the September 1955 fire which eliminated Mellody's milling operation, and left only the shell of a dogfood business as the only hope for salvaging the plaintiff's open account advances of $450,253.28. Much effort and expense had gone into advertising and promoting the dogfood business in the preceding years, and as a matter of business judgment Mellody's principals decided to gamble on its eventual success by pouring additional moneys into it, despite the poor prospects which Mellody's disastrous fire and growing insolvency presented.

As of December 31, 1955, the book value of Mellody's assets was only $90,457.91 as compared to liabilities of $632,156.35, so that creditors at that time could expect on liquidation to receive only 14.31 percent recovery on their debts, even without considering liquidation costs and preferred claims (such as that part of plaintiff's account secured by the Illinois vendor's lien), which would further reduce if not eliminate the assets available for distribution to general unsecured creditors. The disparity between assets and liabilities is further heightened if plaintiff's chargeoff date of March 31, 1956, is used, for Mellody lost $95,185.75 in the calendar year 1956 due largely to pouring good money after bad into advertising the fading dogfood business, and proration of that loss for the quarter year ending March 31, 1956 would have further reduced the distributable assets by $23,796.44, leaving only $66,661.47 for distribution to creditors, or a gross 10.55 percent of their claims. Under normal circumstances a company in Mellody's financial position would have been ripe for bankruptcy or suit by arms-length creditors, but such steps are not necessary to establish the worthlessness of debts. United States v. Collier, 104 F.2d 420 (5 Cir., 1939); Regulations Section 1.166-2(b). As with a turnip, squeezing Mellody would produce neither blood nor money.

Another way of looking at the problem is that none of the $405,227.95 (90 percent of $450,253.28) charged off by plaintiff as of March 31, 1956, was ever recovered. By March 31, 1960, Mellody's debit balance with plaintiff had increased to $528,324.49, the margin of increase being considerably in excess of the $47,130.87 realized in 1959 by the sale of Mellody's assets, so that the assets sold in 1959 were not even sufficient to pay for the *increase* in Mellody's debt to plaintiff since March 31, 1956, much less dent the $450,253.28 debit balance existing on that date. This may be a reflection on plaintiff's judgment in continuing a losing proposition, but certainly does not support the defendant's position that the account was anything other than worthless as of March 31, 1956. The $47,130.87 realized on the sale of the assets in 1959 was curiously close to the $45,025.33 which plaintiff considered as of March 31, 1956 to be eventually recoverable.

■ Proof of partial worthlessness of Mellody's debt to plaintiff is not disturbed by Mellody's continuance in business after March 31, 1956. Mellody did not have to be extinct on that date for the debt to be considered uncollectible for practical purposes. A comparable situation existed in Robert Y. Moffatt (1965) P-H T.C. Memo. 1965-183, where the Tax Court permitted a partial chargeoff

even though thereafter the debtor remained in business on a limited scale in the hopes of selling its remaining properties and meeting its debts.

█ Defendant's concluding argument as to partial worthlessness on March 31, 1956, is that the chargeoff was as to part of a longstanding, fluctuating open account and thus not of a specific debt as the regulations require. International Proprietaries, Inc., 18 T.C. 133, cited in support of this contention, is not in point. On several occasions this and other courts have held final open account balances to be allowable for deduction as specific debts, as in George E. Warren Corp. v. United States, supra.

█ The plaintiff is entitled to a deduction from its gross income to the extent of $405,227.95 in the fiscal year ended March 31, 1956, and the disallowance of such deduction by the Commissioner of Internal Revenue was clearly in error. Accordingly, plaintiff is entitled to judgment in the amount of $251,912.-90, together with interest thereon according to law.